The **WILDERNESS SOCIETY,** Idaho **Conservation League, Inland Empire Public Lands Council, Ecology Center, Friends of Clearwater, Idaho Rivers United, and Clearwater Biodiversity Project, Plaintiffs,**

v.

Dale **BOSWORTH, Regional Forester; James Caswell, Forest Supervisor, Clearwater National Forest; and U.S. Forest Service, an agency of the U.S. Department of Agriculture, Defendants.**

**Intermountain Forest Industry Association, Resource Organization on Timber Supply, Ltd., Bennett Lumber Products, Inc., and Three Rivers Timber, Inc., Intervener Defendants.**

**Associated Logging Contractors, Inc., a non-profit corporation, Intervener Defendant.**

No. CV–97–208–M–LBE.

United States District Court, D. Montana, Missoula Division.

July 20, 2000.

Elizabeth A. Brennan, Rossbach Brennan, P.C., Missoula, MT, Laird J. Lucas, William M. Eddie, Land and Water Fund of the Rockies, Boise, ID, William A. Rossbach, Rossbach Brennan, P.C., Missoula, MT, for Wilderness Society, Idaho Conservation League Inland Empire Public Lands Council, Ecology Center, Friends of Clearwater, Idaho Rivers United, Clearwater Biodiversity Project.

John W. Watts, U.S. Dept. of Justice, Env. & Nat. Resources Div., Washington, DC, Edward A. Boling, U.S. Dept. of Justice—Gen. Litigation Section, Washington, DC, William W. Mercer, Office of U.S.

Atty., Missoula, MT, Daniel W. Pinkston, U.S. Dept. of Justice, Env. & Nat. Resources Div., Denver, CO, Christine Reck Everett, Office of Gen. Counsel, U.S. Dept. of Ag., Missoula, MT, for Dale Bosworth, James Caswell, U.S. Forest Service.

Rebecca W. Watson, Gough, Shanahan, Johnson & Waterman, Helena, MT, Jeffrey M. Hindoien, Gough, Shanahan, Johnson & Waterman, Helena, MT, Nancy A. Wolff, Richard S. Christensen, Morris and Wolff, St. Maries, ID, for Associated Logging Contractors.

Patrick D. Madigan, Rosholt, Robertson & Tucker, Boise, ID, Bruce M. Smith, Moore Smith Buxton & Turcke, Boise, ID, Steven R. Brown, Garlington, Lohn & Robinson, PLLP, Missoula, MT, Lucy T. France, Garlington, Lohn & Robinson, PLLP, Missoula, MT, for Intermountain Forst Industry, Association, Resource Organization on Timber Supply, Ltd., Bennett Lumber Products, Inc., Three Rivers Timber, Inc.

## ORDER

ERICKSON, United States Magistrate Judge.

This action seeks judicial review of Forest Service projects on the Clearwater National Forest under the National Forest Management Act (NFMA), the National Environmental Policy Act (NEPA), a court-approved settlement agreement outlined in the Stipulation of Dismissal of *The Wilderness Society v. Robertson,* No. 93–0043–S–HLR (D.Idaho 1993) (referred to by the parties as the "TWS Settlement"), and the Clean Water Act (CWA).[1] Further, the Plaintiffs request costs and attorney fees under the Equal Access to Justice Act regarding these claims. The parties have consented to the jurisdiction of the magistrate judge for these proceedings pursuant to 28 U.S.C. § 636(c). Pending before the Court are a number of motions. The motions have been fully briefed,

deemed submitted, and heard at oral argument. The Court being informed now enters the following order:

1. Plaintiffs' motion is **GRANTED** and Defendants' cross-motion is **DENIED** for partial summary judgment on Old Growth Violations regarding the 10% standard.

Plaintiffs' motion is **DENIED** and Defendants' cross-motion is **GRANTED** for partial summary judgment regarding Old Growth violations regarding the 5% standard.

2. Plaintiffs' Motion for Partial Summary Judgment regarding Monitoring Violations is **DENIED.**

3. Plaintiffs' and Defendants' motion for partial summary judgment regarding the Fish Bate Projects are **GRANTED IN PART and DENIED IN PART** as more fully set forth herein.

4. Plaintiffs' Motions to Strike Reply Declarations or for Leave to File Surreply on Fish Bate Motions is **DENIED.**

5. Intervener Associated Logging Contractors' Motion for Partial Summary Judgment on the TWS Settlement is **GRANTED IN FAVOR OF PLAINTIFFS AND DEFENDANTS.**

6. Defendants' Motion for Summary Judgment on all remaining claims is **DENIED.**

## I. *BACKGROUND*

The Clearwater National Forest encompasses approximately 1.8 million acres of mountainous federal land in north-central Idaho. The focus of this action is primarily on two forest-management project decisions named after the watersheds in which they occur; the Fish Bate Salvage (Fish Bate) project and the White Pine Creek (White Pine) project[2]. The Fish Bate project area lies to the south and west of a bend in the North Fork of the Clearwater River above Dworshak Reservoir, and in-

---

1. Plaintiffs alleged claims under other laws as well. This issue is addressed below in Defendants' summary judgment motion on the entire Complaint.

2. Plaintiffs alleged violations regarding other project decisions which will also be addressed herein.

**1088**

cludes the watersheds of Fish and Bates Creeks among others. (Administrative Record (AR) Fish Bate, Vol. 11, Doc. 25.) This project is in a landscape managed entirely by the Forest Service. The White Pine project is in a landscape composed of federal, state and private lands. The project area is located within Latah and Benewah Counties in Idaho. Proposed activities would occur primarily within the White Pine Creek and Blakes Fork Creek tributaries of Meadow Creek, which flows into the upper Palouse River. Limited activity would also take place in upper Hangman Creek, which drains into the Spokane River. (AR White Pine, Vol. 4, Doc. 5.) Specific facts concerning the projects will be discussed as relevant to each motion.

## II. STANDARD OF REVIEW

### A. ADMINISTRATIVE PROCEDURE ACT

■ Plaintiffs seek relief under the Administrative Procedure Act (APA), which permits judicial review of final actions of agencies of the United States. The APA imposes a narrow and highly deferential standard of review. Pertinent to this action, the Court's review is limited to a determination of whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). The party challenging the agency action has the burden of showing there is not "a rational connection between the facts found and the choice made" or that there was a clear error in judgment based on the relevant factors. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). An agency's decision is arbitrary and capricious if the agency, *inter alia,* has "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ." *Motor Vehicle Mfrs.,* 463 U.S. at 43, 103 S.Ct. 2856.

■ "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Volpe,* 401 U.S. at 416, 91 S.Ct. 814. In making a determination under the arbitrary and capricious standard of the APA, a court is to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706 (1994). Thus, the scope of such a review is necessarily limited to the administrative record before the decisionmaker and placed before the reviewing court. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *See also Friends of the Earth v. Hintz,* 800 F.2d 822, 828–9 (9th Cir.1986). In applying this standard, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

Moreover, the focus of judicial review under the APA must be upon the record before the agency at the time it made its decision, and not upon subsequent events or rationales after the fact. *Volpe,* 401 U.S. at 419–21, 91 S.Ct. 814; *Asarco, Inc. v. United States Envtl. Protection Agency,* 616 F.2d 1153, 1159–60 (9th Cir.1980); *Alvarado Community Hosp. v. Shalala,* 155 F.3d 1115, 1124 (9th Cir.1998). The Ninth Circuit allows consideration of extra-record materials in four circumstances:

> (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter, and (4) when the plaintiffs make a showing of agency bad faith.

*Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660, 665 (9th Cir.1998)(internal quotes omitted). Such supplementation of the record should be a limited exception

and the supplemental information viewed for its narrow purpose. *Asarco,* 616 F.2d. at 1159–60 (9th Cir.1980) ("When a reviewing court considers evidence that was not before the agency, it inevitably leads the reviewing court to substitute its judgment for that of the agency.").

And finally, "[w]hen specialists express conflicting views, an agency [has] the discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Greenpeace Action v. Franklin,* 982 F.2d 1342, 1350 (9th Cir.1992)(citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

### B. *SUMMARY JUDGMENT*

Disposition on the merits by way of summary judgment is appropriate where no genuine issues of material fact exist, and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To defeat a motion for summary judgment, the nonmoving party must set forth specific facts that show there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Supreme Court has made clear that summary judgment is the principal tool for eliminating factually and legally insufficient claims. It is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

Summary judgment is a particularly appropriate means of resolving claims against forest management decisions by the U.S. Forest Service. *Resources Ltd. v. Robertson,* 789 F.Supp. 1529, 1534 (D.Mont.1991), affirmed in part and reversed in part, 35 F.3d 1300 (9th Cir.1993). Further, summary judgment is appropriate in cases raising the issue of whether an agency's NEPA documentation sufficiently explains the environmental consequences of the agency's proposed action. *Resources Ltd.,* 789 F.Supp. at 1534. There are no material facts essential to the Court's resolution of this action because the basis for the Court's review is the agency's administrative record, and the Court need not, indeed, may not, "find" underlying facts. Rather, the issues presented here are issues of law and, as such, are appropriate for resolution by summary judgment. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883–884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

### III. *CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT REGARDING OLD GROWTH VIOLATIONS*

### A. *THE NATIONAL FOREST MANAGEMENT ACT*

The National Forest Management Act (NFMA) is the principal statute governing administration of the National Forests. It imposes numerous substantive management requirements, as well a two-step planning process to develop forest-specific management provisions. *See* 16 U.S.C. §§ 1600 et seq.; *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 728, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1153 (9th Cir.1998); *Inland Empire Public Lands Council v. USFS,* 88 F.3d 754, 757 (9th Cir.1996) (all discussing NFMA and its forest planning requirements). For each of the units of the National Forest System, the NFMA requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans...." 16 U.S.C. § 1604(a) (1994). The Clearwater Land and Resource Management Plan (Forest Plan) was adopted with the signing of the Forest Plan Record of Decision (ROD) in September 1987. (AR Programmatic, Vol. 1, Doc. 1 & 2.) The Forest Plan includes forest-wide standards applicable to the federal land administered by the Clearwater National Forest. (*Id.* at Doc. 2, p. 20–40.)

■ NFMA requires that all timber contracts and other resource management "plans and permits, contracts, and other

instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i) (1994).[3] Therefore, site-specific projects must "be consistent with the land resource management plan of the entire forest." *Neighbors of Cuddy Mountain v. USFS*, 137 F.3d 1372, 1377 (9th Cir.1998); *See also Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1070 (9th Cir.1998); *Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir.1999) (holding timber sales unlawful for lack of consistency with Forest Plans).

Among its substantive requirements, NFMA provides that the Forest Service must "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B) (1994). To ensure such diversity, the Forest Service has adopted regulations which require that:

> Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19 (1999).[4]

**3.** *See also* 36 C.F.R. § 219.10(e) (1999), "Forest Supervisor shall ensure that, subject to valid existing rights, all outstanding and future permits, contracts, cooperative agreements, and other instruments for occupancy and use of affected lands are consistent with the [Forest] plan."

**4.** *See also* 36 C.F.R. § 219.27(a)(6) (1999). "All management prescriptions shall ... [p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species and provide that habitat for species chosen under § 219.19 is

## B. *THE CLEARWATER NATIONAL FOREST PLAN STANDARDS*

Chapter Two of the Clearwater Forest Plan adopted standards to guide future project development and implementation in compliance with NFMA's requirements. The Forest Plan emphasized that these standards "should be considered as minimum requirements that must be met." (AR Programmatic, Vol. 1, Doc. 2, p. 20.) The standards are divided by subject. "Wildlife and Fish" is one of the subjects. Two of the twelve standards for wildlife and fish are standards for old growth habitat which read as follows:

> (d) Provide for old-growth dependent wildlife species by:
>> (1) Maintaining at least 10 percent of the Forest (including Selway–Bitterroot Wilderness) in old-growth habitat.
>> (2) Selecting at least 5 percent of each approximate 10,000 acre watershed (timber compartment) or combination of smaller watersheds (subcompartments) within forested nonwilderness areas to manage as old-growth habitat.

(AR Programmatic, Vol. 1, Doc. 2, p. 23.)[5]

The Forest Plan defines "old growth" for purposes of meeting these habitat standards as "a stand that is past full maturity and showing decay; the later stages of Forest succession." (AR Programmatic, Vol. 1, Doc. 2, App. H–1.) The Forest Plan also contains guidelines for the identification of old growth habitat that meets this definition, under which "stands must meet most of [eight] requirements to be considered old growth."[6] However, stands need

maintained and improved to the degree consistent with multiple-use objectives."

**5.** *See also* (AR Fish Bate, Vol. 11, Doc. 26, p. 94–96.) (stating that the "Clearwater Forest Plan contains two standards for old growth management to insure that there is sufficient habitat to support viable populations of all indigenous old growth-dependent species").

**6.** The Old–Growth and Snag Habitat Management Guidelines are listed as follows:
 1. 15 or more live trees per acre.
 2. One or more snags per 2 acres over 21 inches d.b.h.

not meet all the requirements to be considered old growth. The guidelines also contain ten criteria for the management of old growth habitat.[7] The Clearwater National Forest has recently followed a refinement of the Forest Plan definition of old growth habitat, known as the "North Idaho Old Growth" definition. (AR Programmatic, Vol. VII, Doc. 53.) [8]

## C. *THE PARTIES' POSITIONS*

Plaintiffs' Old Growth motion alleges that the Forest Service is violating the NFMA "consistency" requirement, because the Clearwater National Forest is allegedly failing to adhere to Forest Plan standards for old growth habitat. Specifically, Plaintiffs allege the old growth status reports which are used to verify the Forest is meeting the 10% standard fail to account for errors found during field verification and other classification errors. Plaintiffs assert that reliance on these reports is arbitrary and capricious under the APA because projects approved based on the results of these status reports are therefore not consistent with the 10% standard in the Forest Plan.

Defendants contend that Plaintiffs may not bring "generalized" challenges to the Forest Service's alleged failure to meet Forest Plan requirements. Defendants further contend that they are entitled to rely on the opinions of their experts and that the status reports serve as a reasonable basis upon which to determine that the Clearwater Forest is meeting the 10% standard. Finally, Defendants assert that the status reports show the Clearwater National Forest is meeting the 10% standard for old growth.

## D. *ANALYSIS*

## 1. *FINAL AGENCY ACTION*

The U.S. Supreme Court and the U.S. Courts of Appeal have made clear in several recent decisions that challenges to the Forest Service's alleged failure to meet forest-wide standards or requirements may be brought within the context of site-specific claims. "Any such ... challenge might also include a challenge to the lawfullness of the present Plan (but only if) the present Plan then matters, i.e., if the Plan plays a causal role with respect to the future, then-imminent, harm ...." *Ohio*

3. Two or more canopy levels, heart rot and other signs of stand decadence.
4. Overstory canopy closure of 10–40 percent
5. Usually with a definite shrub-sapling layer of at least 15 feet tall with a canopy closure of over 40 percent.
6. With understory and overstory canopy combined, exceeding 70 percent.
7. With significant coarse woody debris, including snags (>10/AC over 20 feet) and downed logs (>20 ton/AC and snag and longs) (minimum 4/AC) that are large (21 d.b.h.) and > 50 feet long.
8. Live tree component of various species with wide range in sizes and age including long-lived seral dominates. More than 10 live trees/AC that are either old or have become large (>21 d.b.h.).
(AR Programmatic, Vol 1, Doc. 2, App. H–1.)

7. The management guidelines most relevant to the issues here are as follows:
1. The 10 percent minimum old growth to be maintained may be found in wilderness, research natural area, riparian areas, travel corridors, and areas identified as unsuitable for timber as well as areas suitable for timber harvests.

2. For purpose of achieving the 5 percent of each 10,000 acre minimum standard, timber compartments will be used as the basis of measurement.
3. The minimum size of an area that can be considered old growth is 25 acres. However, to insure optimum wildlife diversity and abundance, somewhat larger stands of approximately 80 acres are the preferred minimum. (Thomas 1979).
. . .
7. For those 10,000 acre units without any old growth because of past fires or timber harvesting, select replacement stands.
. . .
9. Existing old-growth stands may be harvested when there is more than 5 percent in an old-growth unit, .and the Forest total is more than 10 percent, *or* a replacement stand becomes available. (emphasis in original).
. . .
(*Id.* at H–1 to H–2.)

8. The North Idaho Old Growth definition applies criteria similar to those of the Forest Plan to nine different types of habitat, distinguished by dominant tree species and climate.

*Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734–37, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *Wilderness Society v. Thomas*, 188 F.3d 1130 (9th Cir.1999); *Sierra Club v. Peterson*, 185 F.3d 349 (5th Cir.1999). In *Wilderness Society*, for example, the Ninth Circuit followed *Ohio Forestry* in rejecting, as nonjusticiable, a generalized claim that the Prescott Forest Plan was adopted in violation of NFMA requirements concerning grazing suitability; yet the Ninth Circuit nevertheless addressed the same claims brought as part of the plaintiffs' challenges to specific allotment grazing decisions. *See* 188 F.3d at 1133–35.

Similarly, in *Ecology Center v. USFS*, 192 F.3d 922 (9th Cir.1999), the Ninth Circuit affirmed a decision of this Court which held that forest plan "failure to monitor" claims were not justiciable, when brought on a forest-wide basis without challenging any specific final agency action. By contrast, the Ninth Circuit and other courts have resolved similar "failure to monitor" claims when brought within the context of challenges to specific timber sale decisions. *See Inland Empire Public Lands Council v. USFS*, 88 F.3d 754 (9th Cir.1996); *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir.1999); *Sierra Club v. Peterson*, 185 F.3d 349 (5th Cir.1999).

■■ In accord with the foregoing, to the extent Plaintiffs' motion is directed generally at the Clearwater National Forest, its motion is denied. To the extent Plaintiffs' motion is directed at particular final agency action, the Court may properly consider forest-wide standards within the context of Plaintiffs' challenges to those actions. Here, Defendants do not dispute that the Fish Bate and White Pine

sales are properly before the Court on this motion. Therefore, in alleging that the Forest Service violated the Forest Plan's forest-wide standards for old growth habitat when the Fish Bate and White Pine projects were approved, Plaintiffs have properly identified site-specific final agency action which permits consideration of the forest-wide standards. Accordingly, as to these projects, Plaintiffs' claims are ripe and justiciable by the Court.[9]

### 2. THE 10% STANDARD AND THE FISH BATE PROJECT

The Fish Bate Final Environmental Impact Statement (FEIS) relied on the August 1995 Old Growth Report issued by the Clearwater National Forest to determine that the proposed old growth logging would be consistent with the Clearwater Forest Plan's 10% old growth habitat standard. (Fish Bate FEIS, AR Fish Bate, Vol. 11, Doc. 25, p. 97.) The FEIS stated:

A comprehensive and detailed assessment of the current amount and distribution of old growth habitat on the Clearwater National Forest was conducted in winter 1992 and updated in August 1995. This analysis was performed to determine if the Forest Plan standards for old growth management were being met. The 1995 updated old growth status report shows that a sufficient amount of old growth habitat has been identified forest-wide to meet the Forest Plan standard of 10 percent.

*Id.*[10]

Both the 1992 Old Growth Status Report and the August 1995 updated report have been submitted with the Administrative Record filed by Defendants. (AR Programmatic, Vol. 7, Docs. 52 & 46.) Those

9. Plaintiffs' motion regarding old growth was directed at the Fish Bate and White Pine projects, as well as other "unnamed" timber sales. At this time, only the Fish Bate and White Pine projects constitute final agency action. Any other "unnamed" projects are therefore not included in this motion and Plaintiffs must bring a separate action regarding those projects. See Defendants' Motion for Summary Judgment on the entire Complaint discussed below.

10. The Fish Bate FEIS was issued in January 1996, and provided the basis for the Fish Bate Record of Decision signed by Clearwater Forest Supervisor Caswell on January 31, 1997. (AR Fish Bate, Vol. 11, Doc. 25.) The Fish Bate FEIS states that the project will log 888 acres of old growth habitat within the Fish Bate project area on the North Fork Clearwater River, although Defendants now assert that the amount of old growth has been reduced to some 500 acres through post-deci-

reports contain district-by-district assessments of the acreage of old growth habitat believed to be present on each district.[11] The old growth acreage reported for each district is broken down into three categories in the 1995 report: "field verified" old growth, "tentatively identified" old growth, and NEPA Designated old growth.

The August 1995 Old Growth Report lists 183,104 total acres of old growth habitat (including the Selway–Bitterroot Wilderness), comprising 10.3% of the Clearwater National Forest. Of this total, 7,503 acres are "field verified" (4.1%), 162,159 acres are "tentatively identified", (88.6%) and 13,422 are "NEPA Designated Old Growth" (7.3%). (AR Programmatic, Vol. 7, Doc. 46, p. 6.)

Plaintiffs challenge Forest Service reliance on the August 1995 Old Growth Report in approving the Fish Bate sale, arguing that the Forest Service should have reduced the estimated old growth figures in the report to account for the results of field inspections of "tentatively identified" old growth stands. Plaintiffs point to field verification results reported by Clearwater National Forest biologists prior to the August 1995 report, which found that "tentatively identified" old growth estimates overstated actual old growth habitat by significant amounts. As stated in one analysis:

> On average, about 50% of what is tentatively identified as old growth forest is determined to be old growth following field verification. It is clear that not all of the tentatively identified old growth in the analysis area would be considered old growth if it were field checked. Based on the best information available to date, it is reasonable to estimate that 50% of what has been tentatively identified as old growth may not meet the criteria in Appendix H of the Forest Plan and supplemented with the more refined definitions found in Old–Growth Forest Types of the Northern Region (Green et al.1992).

Decision Notice, Crooked Fork Environmental Analysis, p. 65 (1993).[12] Plaintiffs allege that Clearwater National Forest staff generally recognized that an "old growth falldown" factor should be applied to "tentatively identified" old growth stands.[13]

The Plaintiffs also allege that the practice of accounting for differences between

---

sion harvest area restrictions. According to the FEIS, the Fish Bate timber sale will include logging in a "relatively unfragmented band of cedar habitat type old growth" along the North Fork Clearwater River, which "provides valuable habitat for many old growth-associated wildlife and sensitive plant species within the analysis area." (AR Fish Bate Vol. 11, Doc. 26 at 97.) The FEIS acknowledges that, forest-wide, "the amount and distribution of old growth habitats in the cedar types is likely to be well below the range that naturally occurred at the landscape level," and thus implementing the chosen Alternative 7 of the Fish Bate project would result in "adverse and significant" cumulative effects that "would maintain this downward trend." (*Id.,* p. 171.)

**11.** The Fish Bate project is in the Northfork district of the Clearwater. The 1995 status report shows this district as having 6.4% old growth.

**12.** Plaintiffs cite to Clearwater National Forest Service documents that are not specifically part of the Fish Bate project administrative record. However, because they are alleging a violation with regard to a forest-wide standard, this Court must consider Forest Service documents that are relevant to the 10% standard. *See Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660, 665 (9th Cir.1998) (Consideration of extra-record materials allowed if necessary to determine whether the agency has considered all relevant factors and has explained its decision.)

**13.** *See* Trend Estimates of Old Growth Habitat Percentages, Clearwater National Forest and Powell Ranger District (July 1991) (estimates of old growth discounted 60–90%);

White Sand Final EIS, Project File, Vol. 9, Memo of Andrea Kirn and Kim Ragotzkie regarding White Sand EIS Old Growth Verification (Dec.1993) ("The data does strongly suggest that a large percentage falls out as currently not being old growth." Forest Service field inspection found that of sixty-three (63) "tentatively identified" old growth stands visited, only 36—or 57%—were verified as old growth.);

West Fork Papoose FEIS, at III–27 (1995) (Of the stands checked, field review found that

field verified and tentatively identified old growth was generally known by other agencies:

> We are concerned as to whether or not the forest is adequately maintaining Forest Plan Standards for old growth of 10% forest wide and that old growth habitat types are becoming increasingly fragmented within the Clearwater Refugium Ecosystem. We do not agree with your assumption that the 10% standard is being maintained.... Field surveys performed by your agency have shown an average of only 50% of the tentatively identified old growth actually meeting old growth criteria.

Letter from Herbert A. Pollard, Regional Supervisor, Idaho Fish & Game Dept. to Arthur S. Bourassa, District Ranger, Clearwater National Forest regarding the Fish Bate project (June 12, 1995)(AR Fish Bate, Vol. 6, Doc. 15, p. 59–60.)

Plaintiffs contend that Forest Service failure to consider these field verification results or to apply an "old growth falldown" factor to the tentatively identified old growth estimates in the August 1995 Old Growth Status Report is arbitrary and capricious. Plaintiffs argue that the August 1995 report thus inflates the actual old growth acreage reported on the Clear-

water. Plaintiffs assert that if the "tentatively identified" old growth estimates were reduced to account for this practice, the total old growth habitat in the August 1995 report would fall significantly below the 10% forest-wide standard. Accordingly, Plaintiffs conclude the Fish Bate FEIS is arbitrary and capricious in relying on the August 1995 report to determine that logging of further old growth habitat will not violate the Forest Plan 10% standard.

Plaintiffs argue that the old growth acreage in the status reports should be reduced for other reasons as well. Plaintiffs assert that 5903 acres are in stands less than 25 acres in size and are counted towards old growth in violation of the Forest Plan management guideline which designates a 25 acre minimum size and 80 acre preferred size for old growth stands.[14] They assert that isolated old growth stands or stands laced with roads should not be counted because the edge effects create unsuitable habitat for old growth dependant species. Plaintiffs also note that the old growth includes 3670 acres of stands that have experienced complete past harvest and 6170 acres that have experienced partial past harvest. Plaintiffs assert that past harvest activities should disqualify a stand from consideration as old growth.[15]

29% of "tentatively identified" stands were not old growth habitat);
Kim Ragotzkie, Powell District wildlife biologist, Item H, OG Falldown (handwritten calculations) (Nov.1993) (analysis of four timber sales on the Powell District in 1993 concluded that only 58% of tentatively identified old growth was actual old growth);
Letter from Charles Lobdell, Idaho State Supervisor, U.S. Fish and Wildlife Service, to Margaret Gorski, District Ranger, Powell Ranger District (Feb. 3, 1994) (field verification efforts on the Powell District and the Clearwater Forest show "a similar pattern is emerging, with an average of only 50% of the tentatively identified old growth habitat actually meeting old growth criteria contained in Appendix H of the Forest Plan");
Clearwater National Forest biologist Harry Jageman, Old Growth—Late Successional Forest Inventory, Palouse Ranger District, (Nov.1997) (AR Programmatic, Vol. 7, Doc. 45.) ("With these low numbers, it has be-

come apparent to the district that late successional stands ... are very important in maintaining habitat quality for species dependent on older forests.... Field verification efforts suggest that about half of the stands identified in our database [as old growth] are actually old growth or late successional forest.").
See, however, footnote 16 referencing Forest Service reports describing some specific examples where field verification resulted in an increase in old growth.

**14.** Plaintiffs note that a sizable number (>30,-000 acres) of old growth stands fall between 25 and 80 acres.

**15.** Plaintiffs cited other errors found in the data supplied to them by Defendants that potentially reduce old growth by 35,868 acres. Defendants assert that the Plaintiffs misinterpreted some of the information because it was out-of-date and inapplicable. However, because resolution of this issue is

The Defendants contend that they are entitled to rely on the opinions of their agency experts, that the 1995 Old Growth Status Report was compiled using their best information, that tentatively identified acres can result in an increase of old growth when field verified (as happened when the Fish Bate project was field verified),[16] and that there is more than 10% old growth on the Clearwater National Forest. Defendants also argue that the 25 acre minimum stand size is discretionary because it is a guideline rather than a standard and that the decision to include stands that have experienced past harvest as old growth is also discretionary. Defendants' briefings on the Old Growth motions assert that a subsequent old growth status report, issued by the Clearwater National Forest in October 1998, (AR Programmatic, Vol. 7, Doc. 54), reveals that the Forest Service is not violating the 10% old growth habitat standard because it now estimates that at least 11% of the Clearwater National Forest is old growth habitat.

### 3. *CONCLUSION REGARDING THE 10% STANDARD*

Tentative is defined as "of the nature of an experiment or hypothesis ... provisional" or as "uncertain." Webster's 3rd New Int'l Dictionary 2357 (1986). As noted above, an agency acts in an arbitrary and capricious manner when it fails to consider a relevant factor or makes a "clear error in judgment." *Idaho Sporting Congress,* 137 F.3d at 1149 (quoting *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851). An action is arbitrary or capricious when an agency has "entirely failed to consider an important aspect of the problem, [or] offered an ex-

planation for its decision that runs counter to the evidence before the agency ...." *Motor Vehicle Mfrs.,* 463 U.S. at 43, 103 S.Ct. 2856. Finally, the focus of judicial review under the APA must be upon the record before the agency at the time it made its decision, and not upon subsequent events or rationales after the fact.

■ After considering the arguments above, the Court concludes the old growth status reports do not provide sufficient foundation for the "tentatively identified" acres because of the variation found when stands are field verified. Using the tentatively identified acres as a hard number to meet the 10% standard runs counter to the evidence before the agency from the previously cited reports of Forest Service staff setting forth both the upward and downward departure which occurs when tentatively identified acres are subject to field verification. In fact, the evidence that actual acreage varies from tentatively identified acreage is undisputed by the parties and both parties cite variations finding less or more field verified old growth. Defendants themselves argue that the old growth database "is not a static document" but is "dynamic." However, this Court cannot assume these variations up and down cited by the parties balance out each other. Rather, this Court's only role is to review whether the agency properly considered a relevant factor. The 10% standard in the Forest Plan is a minimum, not an average. Therefore, the Defendants' old growth status reports must account for the variation in tentatively identified acres in determining whether the 10% minimum standard is met.[17]

---

not necessary to resolution of this case on its merits I decline to address it.

**16.** The Fish Bate project analysis found a 41% increase in old growth acreage in the project area. (AR Fish Bate Vol. 5, Doc. 13, p. 462–465.)
The Mid Skull project resulted in a 57% increase in old growth acres. (Defs.' Old Growth App. Tab C; Decl. Of Tam White, Attachment 4.)

**17.** Defendants argue below that the 10% standard serves as a monitoring proxy for ensuring the viability of old growth dependent management indicator species. If this standard is to serve as a proxy, such a variation between field verified and tentatively identified acres would render the proxy of questionable reliability in assuring species viability.

Defendants argue that the 1998 Old Growth Status Report accounts for the variation in tentatively identified acres and shows that the Clearwater Forest is meeting is 10% standard. However, the Court must consider the evidence before the agency at the time it made its decision and subsequent events or rationales after the fact should not be considered. First, the 1998 report, completed after this suit was filed, adds a new category of estimated old growth acreage entitled "TSMRS Stands,"[18] which are not allocated to any district. There is no clear explanation why these 26,022 acres, derived from an existing database, were not previously included in the tentatively identified acres. This Court cannot consider after the fact rationalizations in reviewing agency action. *Volpe*, 401 U.S. at 419–21, 91 S.Ct. 814. More importantly, while increasing the amount of potential old growth, the new category again does not address the likely variation found if field verified.

Defendants also point to the fact that other possible old growth stands are mentioned in the 1998 report but are not included in the tentatively identified stands because they require further evaluation. Defendants argue that this category of 90,118 acres accounts for variation in the tentatively identified acres because the stands meet initial screening criteria. However, again, Defendants do not dispute that the 10% standard is a minimum. Asking this Court to accept the use of additional newly identified stands that Defendants do not yet themselves consider old growth to account for the variation between field verified and tentatively identified old growth is a post hoc rationalization that this Court is not allowed to consider under the APA standard of review. Also, Defendants fail to address the possible variation in this class of stands as well,

in determining whether or not the 10% minimum is met. Using databases to derive the tentatively identified acres for the status reports is nothing more than creating a model, which is a type of tool Defendants routinely use in their work.[19] Here, field verification demonstrates the unreliability of the model. Because the 10% standard is a minimum, the Forest Service must account for the variation, the margin of error, in tentatively identified stands. Given the prevailing evidence that field tests more often than not result in a discounting of tentatively identified acres, Plaintiffs have met their burden of showing a relevant factor which Defendants failed to adequately consider in deciding that the 10% standard is met forest wide.

 Regarding the other arguments put forth by Plaintiffs concerning the amount of old growth in the status reports, the 25 acre minimum size requirement in the Forest Plan is a guideline and is therefore discretionary rather than mandatory. *Miller v. United States*, 163 F.3d 591, 594 n. 1 (9th Cir.1998). The decision to include acres that have experienced past harvest is also discretionary because this issue is not addressed anywhere in the Forest Plan. Defendants assert they only include stands under 25 acres that adjoin other stands and are, therefore, not isolated and that stands that have experienced past harvest are included only if the stand still meets old growth criteria. Therefore, Defendants have not abused their discretion on these issues. However, Defendants concede that the 1998 Old Growth Report wrongly included at least 5,481 acres of non-old growth stands due to various errors. Assuming these apparently long-standing errors existed in 1995, the 10.3% of old growth found in the 1995 report

---

**18.** TSMRS stands for Timber Stand Management Record System database.

**19.** Defendants account for margins of error in WATBAL models for stream sedimentation and know a model result is not always accurate and reliable. Defendants use field verifi-

cation to assess the model. (AR Fish Bate Vol. 11, Doc. 26, p. 63.) Using most similar neighbor extrapolations for old growth is no different. However, to insure species viability, the Forest Plan requires that a 10% *minimum* be met.

would be reduced below the required 10% minimum.

Accordingly, the Court finds that the Forest Service reliance on the August 1995 Old Growth Report finding of 10.3% total old growth to determine that the Fish Bate project would not violate the Clearwater Forest Plan's 10% old growth habitat standard was arbitrary and capricious, and must be set aside. Therefore, the Fish Bate FEIS and Record of Decision are reversed and remanded.

### E. *THE 5% STANDARD*

Plaintiffs' Old Growth motion further challenges the alleged failure of the Forest Service to meet the separate Forest Plan standard requiring that 5% of each approximately 10,000 acre compartment be managed as old growth habitat. Unlike the 10% standard, this standard does not require an inventory guarantee of 5% existing old growth in every Old Growth Analysis Unit (OGAU)[20]. Rather, the standard requires only that the Clearwater National Forest *select* 5% to *manage* as old growth habitat. The purpose of this standard is to ensure that old growth will be distributed across the Clearwater National Forest. (AR Programmatic, Vol. 1, Doc. 2, App. H–2.)

There are no criteria for the selection of replacement old growth, however, as stated in the Administrative Record,

[I]ntuitively, stands that would be designated as replacement would be ones that are: 1) the closest to meeting old growth definitions, 2) have not been nor will be significantly altered by management activities unless sufficient rationale and justification are documented to support the designation, and 3) within the scope and bounds of NEPA analysis.

(AR Programmatic Vol. 7, Doc. 46, p. 3.) Therefore, under this standard, areas cho-

sen for management as old growth habitat to meet the 5% standard may include areas currently not old growth but which have been set aside and will not be harvested in order to be managed as old growth. Defendants call these areas "replacement old growth."

The Clearwater National Forest has established 152 OGAU which are being managed so that 5% of each area is managed as old growth habitat. (AR Programmatic, Vol. 4, Doc. 12.) The Forest has identified 63 of the 152 OGAU that, as of March 1992, contained less than 5% old growth habitat.[21] Consequently, the 5% standard and its purpose of ensuring that old growth is distributed across the Clearwater is not being met forest wide. However, the standard does ensure that a minimum of 5% of each OGAU will be set aside for old growth management during project planning and not harvested.

The only question then is whether the White Pine and Fish Bate projects were approved in violation of this standard. The Court concludes they were not.

### 1. *WHITE PINE*

Plaintiffs' challenge to Forest Service compliance with the 5% standard in the White Pine project focuses on the merits of the stands selected for management as replacement old growth. In this project, the Forest Service designated two OGAU. According to the White Pine FEIS, OGAU No. 2–2 has only 0.7% old growth habitat, and OGAU No. 2–4 has 4.5% old growth habitat. (AR White Pine, Vol. 4, p. III–37.) The EIS thus concedes that "neither old growth compartment has sufficient old growth to meet the minimum five percent requirement." *Id.* To address this deficiency in old growth habitat, the White Pine project Record of Decision designates

---

**20.** Provide for old-growth dependant wildlife species by: Selecting at least 5 percent of each approximate 10,000 acre watershed (timber compartment) or combination of smaller watersheds (subcompartments) within forested nonwilderness areas to manage as

old-growth habitat. (AR Programmatic, Vol. 1, Doc. 2, p. 23.)

**21.** Many OGAU have less than 5% old growth habitat due to major wildfires in 1910 and 1933 and timber harvest activities beginning in the early 1930's.

approximately 1,080 acres of mature/late successional forest as replacement old growth in Compartment 2–2 resulting in 14.4% of the compartment being managed for old growth habitat. Likewise, the project designates approximately 1,115 acres in Compartment 2–4 as replacement old growth resulting in approximately 8.8% of the compartment being managed for old growth. (Id., ROD p. 27–28.) This designation exceeds the Forest Plan standard for replacement old growth.

 Plaintiffs challenge Forest Service reliance on replacement old growth in the White Pine project as being contrary to the Forest Plan. The Forest Plan guidelines state that:

> 7. For those 10,000 acre units without *any* old growth because of past fires or timber harvesting, select replacement stands.

(AR Programmatic, Vol. 1 Doc. 2, App. H–2.) (emphasis added). Plaintiffs assert that the Forest Service does not have discretion under this guideline to select replacement old growth unless no old growth exists in a given OGAU. However, this criteria is a guideline, rather than a standard in the Forest Plan. Guidelines, unlike standards, are discretionary rather than mandatory. *Miller v. United States*, 163 F.3d 591, 594 n. 1 (9th Cir.1998). Therefore, the Forest Service has discretion to interpret this guideline in an appropriate manner which includes designating replacement old growth in those OGAU that have some, but less than 5%, old growth. Accordingly, the designation of replacement old growth here is not arbitrary and capricious.

 Plaintiffs further assert that the areas designated as replacement old growth are inferior to other possible areas which will be harvested in the White Pine project. Plaintiffs argue that the replacement stands contain younger stands than the areas to be harvested and that the replacement stands will adjoin harvested areas. Plaintiffs also believe the areas to be harvested provide superior goshawk nesting territory to the areas selected.

Based on these arguments, Plaintiffs believe that the replacement stands will not meet the needs of old growth dependent wildlife. However, "[w]hen specialists express conflicting views, an agency [has] the discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Greenpeace Action v. Franklin*, 982 F.2d 1342, 1350 (9th Cir.1992) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). Therefore, because the Forest Service has designated replacement stands that contain mature/late successional forest which it believes are equal or superior to other possible stands, the Court finds that the White Pine project is not in violation of the 5% Forest Plan standard and that the Forest Service actions in this regard were not arbitrary under the APA. Because none of the remaining motions affect the White Pine sale, the project may proceed.

## 2. *FISH BATE*

 For the Fish Bate project, the Forest Service evaluated four OGAU, two within the project area and two outside the project area. (AR Fish Bate, Vol. 11, Doc. 26, p. 98.) Of these, the Deadhorse OGAU (OGAU No. 10) lacks sufficient old growth to meet the 5% standard. (*Id.* at 98.) This OGAU is outside the project area but borders on it. The Forest Service acknowledged the relevance of the Deadhorse OGAU to the proposed Fish Bate project by including it within the analysis of the Fish Bate project's likely impact on old growth dependent species. (*Id.* at 86–92, 98.) Plaintiffs assert that because the Deadhorse OGAU fails to meet the 5% standard, the Fish Bate project is in violation of the Forest Plan. However, because this OGAU is not actually within the project, the project does not violate the 5% standard. Defendants included this OGAU for purposes of analysis of effects on species, such as the fisher, whose home ranges are larger than the project area.

To hold the Fish Bate project in violation of the Forest Plan 5% standard because of this inclusion would eliminate the Defendants' ability to analyze effects for species whose home ranges are large, such as wolf, lynx, and wolverine. This, again, is well within the discretion of the Defendants. Accordingly, Plaintiffs motion on this issue is denied.

## IV. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING MONITORING

### A. MANAGEMENT INDICATOR SPECIES IN NFMA AND THE FOREST PLAN

To achieve its population viability requirement, NFMA provides for designation of "Management Indicator Species" in the forest plans, "because their population changes are believed to indicate the effects of management activities." 36 C.F.R. § 219.19(a)(1) (1999). Section IV of the Clearwater Forest Plan adopted "Monitoring and Evaluation" requirements in order to "provide the information on the progress and results of implementing the Forest Plan to the decisionmaker and public." (AR Programmatic Vol. 1, Doc. 2, p. IV–8.) The Forest Plan states that the "monitoring requirements for this Forest Plan are outlined in Table IV–1." Table IV–1 is entitled "Forest Plan Monitoring Requirements—Action Plan." It establishes that "Populations Trends of Indicator Species" are to be monitored, including for the designated old-growth Management Indicator Species of pileated woodpecker, goshawk, and pine marten; and that these monitoring results are to be reported every five years. (*Id.*, p. IV–13 to IV–14.)

### B. THE PARTIES' POSITIONS

The Plaintiffs allege that the Defendants failed to conduct the above required monitoring and, therefore, the Fish Bate and White Pine projects were approved in violation of and inconsistent with the above criteria from the Forest Plan. Defendants contend that Plaintiffs failed to exhaust administrative remedies regarding either project on this issue, that maintenance of the old growth standards discussed above can serve as a proxy for monitoring, that effects on management indicator species were studied for these projects, and that they also conduct various monitoring activities, including a contract with a university study.

### C. ANALYSIS

■ In addition to the standards of review discussed at the outset, the scope of this Court's review is further limited by the scope of issues that Plaintiffs raised in their administrative appeals of the challenged decisions. Section 10(c) of the APA requires exhaustion of all intra-agency appeals mandated either by statute or agency rule. 5 U.S.C. § 704 (1994). *See Darby v. Cisneros,* 509 U.S. 137, 146–47, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). The USDA Reorganization Act of 1994, § 212(e), provides that "a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against-(1) the Secretary; (2) the Department; or (3) an agency, office, officer, or employee of the Department." 7 U.S.C. § 6912(e) (1994). Finally, the regulations implementing 16 U.S.C. § 1612 (1994) provide that "it is the position of the Department of Agriculture that any filing for Federal judicial review of a decision subject to review under this part is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the procedures available under this part." 36 C.F.R. § 215.20 (1999).

Thus, the Forest Service appeal regulations at 36 C.F.R. § 215 provide for appeal of decision notices and require exhaustion of administrative appeals. 36 C.F.R. § 215.7 (1999). Under these regulations, an appellant must file a written appeal which provides sufficient written evidence and rationale to show why the decision should be remanded or reversed. 36 C.F.R. § 215.14(a) (1999). The appeal must identify the specific changes in the

decision that the appellant seeks or portion of the decision to which the appellant objects. 36 C.F.R. § 215.14(b)(4) (1999). It must also state how the decision fails to consider comments previously provided and how the appellant believes the decision violates law, regulation or policy. 36 C.F.R. § 215.14(b)(5) (1999).

The Third Circuit has recently interpreted these regulations to require that a complaint's administrative appeal and federal claim:

[M]ust be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court.

*Kleissler v. USFS*, 183 F.3d 196, ·202 (1999). *See also Oregon Natural Resources Council v. United States Forest Service*, 834 F.2d 842, 847 (9th Cir.1987).

In this case, the September 1997 administrative appeal by Plaintiffs Friends of the Clearwater et al. of the White Pine project decision raised four issues as follows: 1) NEPA 40 C.F.R. § 1502.14 (Alternatives); 2) Water Quality and Stipulated Agreement; 3) Forest Health/Purpose and Need; and 4) Old Growth. (AR White Pine, Vol. 12, Doc. 418.) Plaintiffs did incorporate past comments on the White Pine project which included the following comment:

[T]he Forest Service must demonstrate that it can maintain old-growth associated MIS distributed in viable populations across, at a minimum, the Forest Service lands under its management authority.

(AR White Pine, Vol. 5, Doc. 22, p. 2.) However, unlike their specific reference to the old growth standards in the Forest Plan, Plaintiffs did not cite as an issue the failure to monitor old growth dependent management indicator species (MIS) in violation of 36 C.F.R. § 219.19(a)(6) or in violation of Clearwater Forest Plan requirements.

Similarly, in their administrative appeal of the Fish Bate Record of Decision, Plaintiffs did not raise the issue of population data as a requirement of 36 C.F.R. § 219.19(a)(6). (AR Fish Bate, Vol. 10, Doc. 24 p.· 1–41.) Instead, the Plaintiffs' appeal repeated the Ecology Center's March, 1996 comments. These comments complained that the Forest Service ignored references to scientific studies concerning "the amount and quality of nesting and foraging habitat needed [to] maintain populations" of goshawks, that the EIS "says nothing about habitat quality," and that the EIS had "nothing ... upon which to base a sound understanding of the likelihood of maintenance of goshawk populations within the analysis area ...." (*Id.* at 18–20; AR Fish Bate, Doc. 17, p. 112.) Also, like the White Pine appeal, Plaintiffs cited the old growth Forest Plan standards, but did not cite the monitoring section of the Forest Plan.[22] This failure to raise particular claims during the administrative process bars judicial review of those claims.

Plaintiffs assert that their references to "population" concerns satisfies the regulation requiring exhaustion of administrative remedies. That because the old growth standards exist for the purpose of providing for the viability of species, Plaintiffs' extensive concerns regarding old growth habitat implicitly include concerns regarding population viability. This in turn implies a concern regarding the population monitoring requirements in the Forest Plan. Further, the Forest Plan indicates monitoring is the method by which the effectiveness of the old growth habitat standards is to be measured.

However, under the appeal regulations, the appellant must identify the specific changes in the decision that the appellant

22. Plaintiffs did specifically cite the monitoring requirements in their initial appeal of the Sneaky Sheep project in 1991, the forerunner of the Fish Bate project. (AR Fish Bate, Vol.

10, Doc. 24, p. 116.) However, the Administrative Record does not indicate that this appeal was incorporated into Plaintiffs' Fish Bate appeal.

seeks and must also state how the appellant believes the decision violates law, regulation or policy. 36 C.F.R. § 215.14(b)(4) & (5) (1999). For the old growth issues, the Plaintiffs consistently cited the specific sections of the Forest Plan they believed were violated (the 10% and 5% standards). They did not cite the specific monitoring provisions in the regulations or in the Plan that are now at issue. Further, Plaintiffs never specifically requested a change in either project decision to monitor populations. Rather, Plaintiffs asserted that the Defendants have the duty to ensure species viability under their general NFMA duties. Because Plaintiffs' monitoring motion is not "so similar" to its administrative appeal as to put the Defendants "on notice of," and give them "an opportunity to consider and decide" the monitoring issue, Plaintiffs' monitoring motion is dismissed without prejudice.

## V. CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT REGARDING FISH BATE: NEPA CLAIMS

Plaintiffs' motion for partial summary judgment on the Fish Bate project argues that the Fish Bate decision violates the National Environmental Policy Act (NEPA), the TWS Settlement agreement and the Clean Water Act (CWA). Plaintiffs NEPA claims will be considered first, followed by the TWS Settlement claims and then the CWA claims. Plaintiffs bring four NEPA claims, the first of which is a procedural argument. The remaining NEPA claims contest the adequacy of the Fish Bate FEIS.

### A. NEPA: SUPPLEMENTAL EIS

### 1. BACKGROUND

The Fish Bate project has an unusual history in that after the project DEIS was issued in April 1995 as a normal NEPA project, the Defendants changed it to come under the Recissions Act passed by Congress in July 1995. Pub.L. No. 104–19, §§ 2001–2002, 109 Stat. 194, 240–47 (1995).

This change from a normal NEPA project to a project under Pub.L. 104–19 allowed for increased discretion regarding sale preparation and allowed the project to proceed in an expedited manner without an administrative appeal.[23] During this time the Defendants added Alternative 7 which expanded the timber volume of the sale. In January 1996, the FEIS was issued and in March 1996, the Record of Decision (ROD) chose Alternative 7. In July 1996, the Secretary of Agriculture issued a directive that Pub.L. 104–19 could not apply retroactively to certain types of pending projects which included the Fish Bate project. Therefore, the Fish Bate project ROD was withdrawn and reissued in January 1997. The new ROD again selected Alternative 7.

Throughout this process, Plaintiffs submitted comments regarding the project to the Defendants. At the end of their appeal of the FEIS, Plaintiffs stated:

[T]he Appellants have identified numerous deficiencies of the FEIS, and violations of law, regulation and Forest Service Policy. We request a full remand of the Fish Bate Salvage Record of Decision . . . . If the Clearwater contemplates further action in this area, . . . we request that they write a new EIS that corrects the identified deficiencies and violations of law, regulation and Forest Service policy.

(AR Fish Bate, Vol. 10, Doc. 24, p. 24.) Other comments by Plaintiffs include: "[B]etween the draft and FEIS, the salvage rider was passed and a new alternative was inserted into Fish Bate. The new proposal jumped the harvest level up to an unbelievable 27.6 mmbf . . . . We have several serious concerns about this sale . . . . [T]he public trust is being eroded." (AR Fish Bate, Vol. 6, Doc. 16, p. 43.)

### 2. APPLICABLE LAW

Procedurally, Plaintiffs contend that the Forest Service violated 40 C.F.R.

---

**23.** *See* § 2001(c) titled "EXPEDITED PROCEDURES FOR EMERGENCY SALVAGE TIMBER SALES" and § 2001(d) eliminating administrative review. Pub.L. No. 104–19, §§ 2001–2002, 109 Stat. 194, 240–47 (1995).

§ 1502.9(c)(1)(i) which states that an agency must issue a supplement to a draft or final EIS if the "agency makes substantial changes in the proposed action that are relevant to environmental concerns." This regulation is intended to further the NEPA goal of informed agency action and, as such, insures both that substantial changes will receive adequate assessment of environmental impacts and that the public will receive adequate notice to comment on these substantial changes. *See* 40 C.F.R. §§ 1501.1, 1502.1, 1503.1 (1999); *Oregon Envtl. Council v. Kunzman,* 817 F.2d 484, 492 (9th Cir.1987).

### 3. THE PARTIES' POSITIONS

Plaintiffs assert here that a supplemental EIS was required for the Fish Bate FEIS, after it reverted back to normal NEPA procedures, in order to provide adequate notice and comment procedures to the public on the expanded alternative. Plaintiffs base their argument on the fact that the project expanded from 5.8 million board feet (MMBF) to 27.6 MMBF while the project was exempt from normal procedures. Defendants contend that the increase in timber volume is misleading because over half of the increase is due to salvage timber rather than sawlogs.[24] Defendants also argue that Plaintiffs and the public received an adequate notice and comment period on Alternative 7 because they told Plaintiffs the project would be expanded in May 1995 and because they extended the comment period on the FEIS in January 1996 after Alternative 7 was added. Defendants also argue that they determined a new EIS was not necessary because they believed that the FEIS adequately addressed all of the substantive comments from the Plaintiffs and other parties. Finally, Defendants assert that like the monitoring issue, Plaintiffs failed to exhaust administrative remedies.

### 4. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The standard here is the same as that discussed above for the monitoring issue. This Court must determine if this claim for a supplemental EIS was properly administratively appealed, such that it is "so similar" to the administrative appeal that Defendants were "on notice of," and had "an opportunity to consider and decide" whether to issue a supplemental EIS. Here, like the monitoring issue, Plaintiffs did not specifically cite to the regulation requiring a supplemental EIS. However, unlike the monitoring issue, Plaintiffs clearly identified the change they sought when they specifically asked for a new EIS to be prepared. Plaintiffs also directly cited problems with Alternative 7 at least 16 times in their administrative appeal. Therefore, because the Defendants were on notice of Plaintiffs' request for a new EIS and had an opportunity to decide whether to issue one, Plaintiffs properly exhausted the administrative appeals process on this issue.

### 5. SUPPLEMENTAL EIS

The remaining question then is whether Defendants' decision not to issue a supplemental EIS in order to provide for further public notice was arbitrary and capricious under the APA. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373–85, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The extended comment period on the FEIS that Defendants believe gave adequate notice to Plaintiffs was during the period of time that Plaintiffs believed the project fell under Pub.L. 104–19 (January 1996 to March 1996). Therefore, in making their comments the Plaintiffs believed the project would not be subject to administrative appeal and could only receive limited judicial review. After the project was

---

**24.** Between the preferred alternative in the DEIS and preferred alternative in the FEIS for this project, the sawlog volume increased from 8.1 MMBF to 14.9 MMBF and the salvage timber, or "pulp" log volume increased from 7.0 MMBF to 12.7 MMBF. The initial proposed action was for 4.3 MMBF of sawlog volume and 1.5 MMBF of pulp volume. The harvest acreage was 602 in the proposed action, 1,921 in the DEIS preferred alternative and 2,257 in the FEIS preferred alternative.

removed from Pub.L. 104–19 status and the first ROD was withdrawn in July 1996, there is no clear explanation in the record as to the actual status of the project until the new ROD was issued in January 1997. Further, no public comment was taken between July 1996 and January 1997. Finally, the March 1996 ROD and the Jan. 1997 ROD are almost identical.

■ It is plausible and reasonable for Plaintiffs to believe that the project would be reassessed after it was removed from 104–19 status since it had expanded in size and that they would have another opportunity to comment. It also plausible that Defendants believed that the process they had followed under Pub.L. 104–19 was adequate under normal procedures. The history of the process behind this project is certainly not the picture of clarity. However, under the APA standard of review, Defendants' decision must be arbitrary or capricious. Because the Plaintiffs clearly were aware of the expanded size of the project and had an opportunity to comment on it before the first ROD, Defendants were not arbitrary or capricious in their decision not to issue a supplemental EIS as far as the notice and comment purposes of 40 C.F.R. § 1502.9(c).

### B. *NEPA: APPLICABLE LAW FOR SUBSTANTIVE CLAIMS*

■ The Ninth Circuit has established a practical standard for reviewing environmental documents prepared pursuant to NEPA. This standard, described as a "rule of reason," requires agencies to demonstrate "a reasonably thorough discussion of the significant aspects of the probable environmental consequences," *Swanson v. USFS*, 87 F.3d 339, 343 (9th Cir.1996) (quoting *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987)). Under this standard, judicial review consists of insuring that the agency took a "hard look" at environmental conse-

quences. *Neighbors of Cuddy Mountain v. USFS*, 137 F.3d 1372, 1376 (9th Cir. 1998). However, "[t]his court need not 'fly-speck' the [NEPA] document and 'hold it insufficient on the basis of inconsequential, technical deficiencies,'" *Swanson*, 87 F.3d at 343. This standard "guides both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative." *City of Carmel–by–the–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Finally, this standard is essentially a practical way of approaching the arbitrary and capricious standard discussed above. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 n. 23, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

### C. *NEPA: BACKGROUND FOR SUBSTANTIVE CLAIMS*

Under the TWS Settlement agreement, the Clearwater National Forest agreed to "proceed only with those projects that would result in no measurable increase in sediment production in drainages currently not meeting Forest Plan Standards." (AR Programmatic Vol. 6, Doc. 24, p. 3.) [25] The Defendants do not dispute that this constraint applies to Clearwater National Forest project decisions, including the Fish Bate project. (AR Fish Bate Vol. 11, Doc. 25, p. 21–22.) [26] The physical attributes and project design of the Fish Bate project, considered within the context of the above constraint, give rise to the claims at issue here.

The relevant features of the Fish Bate project are as follows: First, the area contains a large volume of dead and dying western white pine infected with an exotic pathogen known as white pine blister rust. (AR Fish Bate Vol. 11, Doc. 26, p. 85–86.) Second, this pathogen and others combined with sixty years of fire suppression have altered species composition and for-

---

**25.** The background of the TWS Settlement is discussed below.

**26.** This provision in the TWS Settlement was adopted by ·the Defendants as part of the

Forest Plan. Therefore, the APA standards of review outlined above apply to the Defendants' application of the provision.

est structural characteristics. (*Id.* at 82–83, 85, 107.) Third, the Fish Bate area is characterized by steep slopes that naturally exhibit a high potential for mass-wasting landslides and erosion. (*Id.* at 53.) More than 70 percent of the area has a high or very high potential for mass wasting landslides. (*Id.* at 54.) Due to the steep slopes of the area, more than 85% of the area may deliver sediment to streams with high or very high efficiency. (*Id.* at 55.) Timber harvest, road construction, high soil saturation and fire all have the potential to accelerate this mass-movement and sediment delivery. (*Id.* at 54, 57.) Fourth, the project area contains several streams which have been impacted by past harvest and road construction. Currently many streams do not meet Forest Plan standards. (*Id.* at 63–66, 78.) Fifth, approximately 44% of the analysis area has already received some type of harvest. (*Id.* at 84.) About 24% of the area was clearcut and the remaining portion was harvested with other techniques. (*Id.*) The area has a road density of about four miles per square mile due to these past activities. (*Id.* at 63–66.) And finally, in November 1995 and February 1996 the area suffered heavy rains and flooding. Due to the weather during that winter, over 900 mass wasting events occurred in the Clearwater National Forest. (AR Flood Vol. 2, Doc. 157, p. 12.) In the project area, many of the stream channels were scoured, roads received damage and a debris torrent occurred in Martin Creek. (AR Fish Bate Vol. 11, Doc. 25, p. 2.)

This background provides the basis for Plaintiffs' NEPA claims. Plaintiffs argue that the FEIS exaggerates the potential for increased sediment due to catastrophic fire risk, that the FEIS fails to assess whether the project will result in increased sediment to area streams due to landslides, and that the FEIS fails to adequately assess cumulative impacts. Defendants assert that the project was designed with this background in mind and that it will result in no net increase in sediment. Defendants rely on the "no increase in sediment" position in finding that the no action alternative poses a greater risk to streams due to catastrophic fire, that the project meets the TWS Settlement constraint, that the project complies with the Clean Water Act, that a supplemental EIS due to the recent flooding is not necessary, and that the project will have no cumulative water quality impacts with other management activities. Plaintiffs' claims regarding fire risk are addressed first, followed by the landslide issue and the cumulative effects issue.

## D. FEIS ASSESSMENT OF FIRE RISK

One of the main purposes of the Fish Bate project outlined in the EIS is to reduce the possibility of a stand replacing fire. (AR Fish Bate Vol. 11, Doc. 26, p. Summary–2.) Defendants note that the area is naturally subject to stand replacing fires every 150–500 years, depending on the forest type. (*Id.* at 107.) Due to the average age of the trees (171 years), the history of fire suppression and the white pine mortality from blister rust, Defendants believe that the possibility of a stand replacing fire is accelerated to the point that it is imminent. Defendants assert that the fuel load in the analysis area is so great that action is needed in order to prevent a stand replacing fire, what they term a "catastrophic event." The FEIS describes this fire risk as an "80% chance of a large, stand replacing event in the next 50 years." (*Id.* at p. 108.)

Defendants further assert that if such an event occurs, sediment deposited into area streams would increase due to loss of vegetative cover and the creation of hydrophobic soil conditions. (*Id.* at 203.) Consequently, Defendants argue that the danger of doing nothing poses a greater threat to water quality from possible landslides than the potential for increased sediment from harvest or other management activities. This theory is given as the likely result in the "no action" alternative in the FEIS. (*Id.*)

Plaintiffs' first substantive NEPA argument claims that this "80% chance of [fire] in the next 50 years" statement is unsubstantiated by the administrative record. Plaintiffs believe the statement is therefore arbitrary and capricious and cannot be used to justify the management prescriptions in the Fish Bate decision.[27] Defendants argue the statement is adequately supported by professional judgment and the Administrative Record.

This dispute is unusual in that the environmental assessment of the no action alternative is at issue, rather than the environmental assessment of the action alternatives. It is also unusual in that the no action alternative supposes a greater environmental impact than the management alternatives. Regardless of this juxtaposition, the issue is still subject to "rule of reason" analysis as outlined above.

After a careful review of the record, the Court finds that there is adequate support in the record to suppose an increased fire risk. This documentation includes fuel loads, (*Id.* at Vol. 2, Doc. 6, p. 6–7), fire suppression history, (*Id.* at Vol. 11, Doc. 26, p. 107), stand age, (*Id.*), disease history, (*Id.*) and the natural role of fire as part of the forest cycle, (*Id.*). The record notes that fuel loads in unharvested areas are above the levels at which fire suppression efforts are effective, which would supposedly allow large, higher intensity fires to occur. (*Id.* at 108.) However, while an increased fire risk is supported, there is little in the record to support how this risk was quantified to suppose an "80% chance of a large, stand replacing event in the next 50 years." Therefore, to the extent this statement is used to presuppose a catastrophic event which will occur as a matter of course if no action is taken, the Court finds the statement unsupported.

■ The issue here is whether this statement is arbitrary and capricious.

Plaintiffs argue the statement cannot be used to justify the management prescriptions in the project decision. However, as far as the underlying purposes which serve to justify a project, under 40 C.F.R. § 1502.13 (1999), Defendants need only "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." Because Defendants have met their burden to "briefly specify the underlying purpose" of the project by demonstrating at least an increased fire risk in the project area, Defendants were not arbitrary and capricious in their assessment of the "no action" alternative.

### E. *FEIS ASSESSMENT OF LAND-SLIDE RISK*

Plaintiffs next contend that the Fish Bate FEIS fails to adequately assess the environmental impacts of the project regarding potential landslides or other mass wasting events. Plaintiffs assert that flood level rainfall occurs in the area about every 20 years and that landslides often result from such weather, given the steep slopes of the Fish Bate area. Plaintiffs argue that the FEIS did not adequately address how the project would affect the possibility of future landslides when heavy precipitation occurs. As a result, Plaintiffs believe the project will likely deliver additional sediment to area streams in violation of the TWS Settlement.

Defendants argue that the project is designed to prevent any increases in sediment due to management activities. Defendants note that the ash cap soils in the area have a high potential to hold water when the soil is relatively undisturbed. (AR Fish Bate Vol. 11, Doc. 26 at 53–54.) The design features cited by Defendants take advantage of this attribute by using helicopters as opposed to building roads, using suspended cable to move logs, leaving buffer strips alongside streams to catch any sediment that is produced by the

**27.** In addition, Plaintiffs ask this Court to strike a number of reply declarations related to the Fish Bate project. Because the Court's decision is based on the Administrative Record and does not rely on any statements in the declarations at issue, Plaintiffs' motion is moot.

logging activities, leaving canopy cover in sensitive areas, and replanting harvested areas.[28] Defendants assert that these management practices, known as Best Management Practices (BMPs) will prevent any additional sediment from the project. Defendants also argue that road reconstruction and road removal activities associated with the project will decrease sediment. Defendants believe that any sediment caused by natural occurrences, such as naturally occurring landslides, do not alter the no impact assessment of the Fish Bate decision. Based on this design, the Fish Bate project Record of Decision concludes, that the project "[W]ill result in no measurable increase in sediment production . . . ." (*Id.* Doc. 25, p. 22.)

### 1. *ANALYSIS*

Because the Defendants argue that the landslide risk from the project is mitigated by the project design and because there is no discussion in the Fish Bate EIS that indicates Defendants considered the frequency of flood level rainfall, the Court's determination of this issue requires judicial review of the "no measurable increase" finding in the FEIS.

In the Fish Bate project area, streams currently do not meet Forest Plan standards. (*Id.* Doc. 26 at 63–66.) The FEIS documents that current levels of sediment delivery to area streams are significantly above normal rates of sediment delivery due to existing conditions on the slopes from past harvest activities. (*Id.*) Against this background of current conditions, WATBAL models predict increased sediment production, due to the logging activities of the Fish Bate project. (*Id.* at 144–150; AR Fish Bate Vol. 9, Doc. 21.) Further, the FEIS predicts that the risk of soil mass wasting is higher under the cho-

sen alternative. (AR Fish Bate Vol. 11, Doc. 26, p. 122.) In addition, prescribed burning was significantly expanded from 43 acres in the preferred alternative in the DEIS (Alternative 6) to 1,256 acres in the preferred alternative in the FEIS (Alternative 7).[29] (*Id.* at 202.) Regarding this increase, the FEIS points out that prescribed burning also increases the risk of mass wasting. (*Id.* at 142.) In order to mitigate the predicted increases in sediment and the increased risks of mass wasting, the FEIS points to and relies on the BMPs for its finding that the project will not result in increased sediment.

██ Mitigation measures are subject to the same general standards of review outlined above. An environmental impact statement must present a "reasonably complete discussion of possible mitigation measures." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In this case, however, the discussion of mitigation measures must be considered within the context of the Defendants' agreement to proceed only with those projects that would result in no measurable increase in sediment production in drainages currently not meeting Forest Plan Standards. Therefore, the Fish Bate FEIS must present a reasonably complete discussion showing that the acknowledged increased risks of landslides will be mitigated such that the project will result in no measurable increase in sediment.

██ After a careful review of the record, the Court finds the FEIS fails to meet this requirement. Defendants conducted a forest wide landslide assessment after the flood events in 1995 and 1996. The study found that "the 1995–96 [flood] events put 10 times the natural landslide background [sediment] rate into the system."[30] (AR

---

**28.** Plaintiffs note the lack of effectiveness of stream-side buffers against channelized debris flow such as landslides. Defendants do not dispute this point. They agree the buffers are not intended to prevent channelized debris flow.

**29.** Prescribed burning is less than 43 acres in all the other alternatives.

**30.** The 1974–76 flood events put three to five times the natural landslide background sediment rate into the system. (AR Flood Review Vol. 2, Doc. 157, p. 24.)

Flood Review Vol. 2, Doc. 157, p. 24.) The majority of these landslides occurred in actively managed areas of the Clearwater. (*Id.*) The study also found landslide rates to be significantly higher under 5,000 feet elevation. (*Id.* at 15) The Fish Bate project elevation ranges from 1,760 to 5,751 feet. (AR Fish Bate Vol. 11, Doc. 26, p. 53.) Finally, the study notes "It was concluded that the slopes that still possess an intact ash cap were not subject to landslides resulting from vegetation removal. However, photo interpretation of landslides occurring in 1995–96 found a large number of landslides in harvest units occurr[ing] on slopes that normally have ash cap soils." (AR Flood Review Vol. 2, Doc. 157, p. 23.) Given that this study establishes an increased landslide rate in managed areas of the Forest, Defendants must show they can mitigate this increased rate of landslides to result in no measurable increase in sediment. Defendants cite to the BMP audits to contend that the practices will effectively mitigate landslide risk. Yet, these audits generally assess sediment delivery to streams due to erosion and do not look at landslide type events. It appears from the project record that none of the 298 BMPs audited in 1996 overlap with the 900 landslides that occurred in 1995–96. Further, as Defendants themselves note, the landslide study *did not* assess the effectiveness of BMPs regarding landslides. (AR Flood Review Vol. 2, Doc. 157 p. vii, 24; *see also* Defs.' Reply Br. in Supp. of Mot. for Summ. J. Re: Fish Bate p. 28.) In addition, the prescribed burn area expanded from 43 to 1,256 acres, but BMPs regarding prescribed burning are not included in the audits.

Because BMPs have not been assessed for their effectiveness against landslide events and because a high risk of landslides is acknowledged in the Fish Bate preferred alternative, the Court finds it is not reasonable for the Defendants to just summarily rely on BMPs to mitigate this environmental impact. Therefore, the Court finds the FEIS conclusion that the project will have no effect on water quality to be arbitrary and capricious based on the undisputed risk of landslides in the FEIS. Accordingly, the decision is reversed and remanded.

### F. *FEIS ASSESSMENT OF CUMULATIVE IMPACTS*

Plaintiffs next assert that the FEIS assessment of the cumulative impacts of the Fish Bate project with other timber projects in the area is inadequate. The FEIS determination of acceptable cumulative impacts was in part based on finding compliance with the 10% standard for old growth forest wide and the finding of "no measurable effect on sediment production" for the project. Regarding water quality, the FEIS reasons that because the project will have no affect on water quality, it will cause no cumulative affects with any other timber sale in the watershed. (*Id.* at 142.) Because the Court has determined to remand the Fish Bate FEIS as discussed above regarding the 10% old growth standard and the no measurable increase in sediment production assessment, the Court will not address this issue further.

### VI. *CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT REGARDING FISH BATE: TWS SETTLEMENT*

Three of the Plaintiffs here (the Wilderness Society, Idaho Conservation League, and Inland Empire Public Lands Council) were also plaintiffs in a suit brought against the Forest Service and its agents in 1993. That suit alleged the Clearwater National Forest Plan was in violation of various federal laws. In September 1993, the parties entered into a settlement agreement which was adopted by the Court as a Stipulation of Dismissal.[31] This

---

**31.** The Plaintiffs state the Stipulation was pursuant to Fed.R.Civ.P. 68. However, no judgment was entered against the Defendants pursuant to the rule. Further, the district court did not cite a specific rule in its dismiss-
al. The Court therefore assumes the case was dismissed pursuant to Fed.R.Civ.P. 41(a) and the agreement will not be construed against the Defendants as it would be under Fed. R.Civ.P. 68.

Stipulation, referred to by the parties as the "TWS Settlement," requires the Forest Service to revise the Forest Plan and adopts interim provisions until the revision is complete. Under the *TWS* Settlement, Plaintiffs challenge the merits of the Defendants' pre-decisional monitoring of sediment in several streams in the Fish Bate project and its judgment that the project will not cause a measurable increase in sediment.

## A. *PRE–DECISIONAL MONITOR-ING*

The pre-decisional monitoring clause of the TWS Settlement reads: "The Forest Service agrees to perform instream analyses, using techniques such as the Riffle Armor Stability Index (RASI), pool riffle ratios and cobble embeddedness." [32] (AR Programmatic Vol. 6, Doc. 24, p. 3.) Plaintiffs contend that the Defendants failed to conduct this pre-decisional monitoring on the North Fork of the Clearwater and Bates Creek. Defendants argue that the language of the TWS Settlement provides the Forest Service with discretion to

choose the type of pre-decisional monitoring conducted, that the Forest Service qualitatively assessed the North Fork, and that Bates Creek did not require pre-decisional monitoring under the TWS Settlement because it is not a "stream segment of concern." Defendants also assert that the Plaintiffs failed to exhaust their administrative remedies on the issue of pre-decisional monitoring.

In their comments to the FEIS, Plaintiffs stated:

> [T]he action will obviously not have "no effect" on the North Fork and its tributaries .... In proceeding with the Fish Bate timber sale, the Clearwater National Forest is violating the settlement's interim water quality provisions.

(AR Fish Bate, Vol. 10, Doc. 24, p. 36.) No further detail follows this statement that serves to clarify how Plaintiffs believed the water quality provisions were violated.[33] Plaintiffs did argue, in a letter incorporated into the appeal, that the FEIS violated the TWS Settlement because it did not indicate how the Defen-

---

**32.** The complete interim water quality provisions of the TWS Settlement are as follows:

d. The Clearwater Forest is committed to the goal of improving and maintaining water quality on stream segments of concern and all Forest watersheds. The Forest Service agrees to proceed only with those projects that would result in no measurable increase in sediment production in drainages currently not meeting Forest Plan Standards. The Forest Service also agrees, as budgets permit, to repair or correct known sediment sources, on Forest Service system lands within these drainages if technically possible. Project plans will include a clearly described watershed improvement objective and identify improvement opportunities and realistic expectations offered by the project proposal. The Forest Service will also annually disclose those actions taken toward achieving the watershed improvement objective. The Forest Service agrees to perform instream analyses, using techniques such as the Riffle Armor Stability Index (RASI), pool riffle ratios and cobble embeddedness. This interim measure shall apply to all new road construction and timber harvest projects that would normally be analyzed and documented by an environmental assessment or an envi-

ronmental impact statement, but would not include categorically excluded projects, which are excluded from these NEPA requirements. This interim measure shall apply to NEPA decisions completed after January 1, 1994. Pre-decisional monitoring and inventory according to the RASI, pool riffle ratio and cobble embeddedness methods will occur on the majority of 1994 projects and on all new roads and large timber sale projects in the years following. All post-decisional monitoring will occur on selected streams representing natural watershed variability and will follow the procedures and intensity outlined in the Clearwater National Forest Soil and Water Monitoring Plan, which is updated annually. Additional monitoring may occur on specific project areas if site specific analysis suggests that such monitoring is needed. (AR Programmatic Vol. 6, Doc. 24, p. 3–4.)

**33.** Plaintiffs did make clear in other areas of the appeal that they believed the project was in violation of the "no measurable increase in sediment" provision of the TWS Settlement because of the steep slopes and other conditions in the project area. (*Id.* at 3–j7, 16–18, 68–70.)

dants would determine whether there was a measurable increase in sediment. (*Id.* at 69.) Plaintiffs stated:

> Since there is no method of sediment measurement [in the FEIS], no definition of "measurable" nor clearly defined baseline data presented in the FEIS there is no way the FS can comply with the Stipulation Agreement.

(*Id.* at 69.) However, Plaintiffs never mentioned, nor indicated, they believed the pre-decisional monitoring clause of the agreement was violated.

 Following the above analysis of exhaustion of administrative remedies, Plaintiffs' claim here is not so similar to those in their administrative appeal such that the Defendants were on notice of the changes sought by the Plaintiffs. Defendants were not on notice that the Plaintiffs believed additional, specific pre-decisional monitoring tests needed to be performed on the North Fork and its tributaries. Therefore, Plaintiffs failed to adequately exhaust their administrative remedies on this issue.

### B. *NO MEASURABLE INCREASE IN SEDIMENT PRODUCTION*

Plaintiffs further claim that the Fish Bate project is in violation of the TWS Settlement provision: "The Forest Service agrees to proceed only with those projects that would result in no measurable increase in sediment production in drainages currently not meeting Forest Plan Standards." Given the above remand regarding the "no measurable increase in sediment production" assessment, this issue is moot.

### VII. *CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT REGARDING FISH BATE: CLEAN WATER ACT*

Based on the above claim that the Fish Bate project will result in increased sediment to project area streams, Plaintiffs also claim that the Fish Bate project violates the Clean Water Act. Defendants contend that the project will not violate the CWA based on the finding of "no increase in sediment production." Given the above remand regarding the "no measurable increase in sediment production" assessment, the Court will not address this issue at this time.

### VIII. *INTERVENER ASSOCIATED LOGGING CONTRACTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE TWS SETTLEMENT*

#### A. BACKGROUND

This Court allowed Associated Logging Contractors, Inc. (ALC) to permissively intervene as a Defendant regarding the TWS Settlement. The Court limited that intervention to ALC's assertion that the TWS Settlement is void as a matter of public policy for violation of the law. ALC then moved for summary judgment in its favor by asking the Court to void the TWS Settlement.

ALC asserts it is entitled to summary judgment under 36 C.F.R. § 219.10(f) (1998) which states that significant amendments to forest plans must undergo public comment procedures, pursuant to requirements under NFMA and NEPA. 16 U.S.C. § 1604(a-m) (1994). ALC asserts that the TWS Settlement makes significant amendments to the Forest Plan and that the Defendants were therefore required to apply the above public comment procedures to the TWS Settlement provisions. As a result, ALC argues that under the APA, 5 U.S.C. § 706(2)(D), the TWS Settlement must be declared void because the Defendants failed to observe the procedures required by law.

Plaintiffs and Defendants argue that ALC's motion is barred by laches, that the TWS Settlement does not make significant amendments to the Forest Plan, that the absence of a public comment process on the provisions of the TWS Settlement is not contrary to NEPA and NFMA requirements, and that the TWS Settlement should not be void as a matter of public policy. Plaintiffs also argue that ALC's motion constitutes a claim against the Forest Service that is not justiciable because ALC does not have standing to bring such

a claim as part of this suit. Because the Court finds below that the TWS Settlement does not significantly amend the Forest Plan, the procedural arguments regarding justiciability and laches are moot.

### B. *APPLICABLE LAW*

Under 36 C.F.R. § 219.10(f):

If the change resulting from the proposed amendment is determined to be significant, the Forest Supervisor shall follow the same procedure as that required for development and approval of a forest plan. If the change resulting from the amendment is determined not to be significant for the purposes of the planning process, the Forest Supervisor may implement the amendment following appropriate public notification and satisfactory completion of NEPA procedures.

There are a number of guidelines for the Forest Service to use to determine whether or not an amendment is significant. 53 Fed.Reg. at 26, 836–37, Forest Service Manual § 1922.52, and Forest Service Handbook § 1909.12, ch. 5.31. However, the determination of whether or not an amendment is significant is a discretionary decision. *Sierra Club v. Cargill,* 11 F.3d 1545, 1548 (10th Cir.1993).

In *Prairie Wood Products v. Glickman,* the court reviewed a regional forester's decision to adopt two screening processes for timber harvests and fish management as non-significant amendments to the forest plans for a number of forests. 971 F.Supp. 457, 462–66 (D.Or.1997). The court ruled the decision was not arbitrary, capricious or an abuse of discretion because the processes were intended to be interim and because they were consistent with the forest plan objectives. Extensive grazing management regulations that affected 19 million acres of forest have also been found nonsignificant for the same reasons. *Arizona Cattle Growers' Assn. v. Cartwright,* 29 F.Supp.2d 1100, 1114–15

(D.Ariz.1998). See also: *Cargill,* at 1548–50 (court ruled changing regeneration standard from five to seven years was nonsignificant and was not an abuse of discretion.) By contrast, policies that are in conflict with the duty under a forest plan and the Endangered Species Act to prioritize protection of a specific species are significant amendments to a forest plan and it is arbitrary and capricious for the Forest Service to adopt such policies without proper NEPA procedures. *House v. U.S. Forest Serv.,* 974 F.Supp. 1022, (E.D.Ky.1997). These cases illustrate the principle that Forest Plans are considered broad, guiding documents, similar to a zoning ordinance. Michael J. Gippert & Vincent L. DeWitte, *The Nature of Land & Resource Management Planning Under the National Forest Management Act,* 3 Envtl. L. 149 (1996); *Swan View Coalition, Inc. v. Turner,* 824 F.Supp. 923, 935 (D.Mont.1992).

In this case, however, ALC disputes the Defendants' exercise of discretion in entering a judicially recognized settlement agreement, rather than Defendants' exercise of discretion in a purely administrative action. Unlike administrative processes, there are no statutory guidelines or specific judicially articulated standards that an agency must follow in negotiating settlement agreements. ALC cites to *Local No. 93 v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405, (1986), for the rule that an agency cannot agree to a settlement the violates the law. However, under the APA, settlement is favored as a way to bring efficient resolution of claims. 5 U.S.C. § 554(c) (1996). Other settlement agreements with the government demonstrate that agencies likely have broader discretion in resolving cases than in following statutory and regulatory procedures.[34] *See Citizens for a Better Env't v. Gorsuch,* 718 F.2d 1117 (D.C.Cir.1983)(holding that a settlement agreement settling up extensive procedures was not contrary to law.);

---

**34.** For example, ALC does not contest that the Defendants had the discretion to enter the first part the TWS Settlement in which they

agreed to implement a complete revision of the Forest Plan.

*see also California Trout v. U.S. Forest Service,* Stipulation of Dismissal No. 94–0563, 1994 WL 665220 (N.D.Cal. Nov.9, 1994)(incorporating detailed interim provisions).

In light of the above precedent regarding significant amendments and settlement agreements, it is clear that the Court must show deference to an agency's judgment in settlement agreements under the APA. Therefore, the standard of review regarding the APA and summary judgment motions discussed at the outset of this opinion applies and this Court may find the TWS Settlement void as a matter of public policy only if the Defendants' determination that the agreement did not significantly amend the Forest Plan is arbitrary, capricious, or an abuse of discretion.[35]

### C. THE PROVISIONS OF THE TWS SETTLEMENT

ALC argues that the provisions of Section II of the TWS Settlement constitute significant amendments to the Forest Plan. Plaintiffs and Defendants argue that the provisions of the agreement are not significant amendments to the Forest Plan because they are consistent with and further the goals and objectives of the Forest Plan and because they are only intended to be in place until the entire Plan is revised pursuant to Section I of the TWS Settlement.[36] The Court will consider each interim provision of the TWS Settlement.

### 1. RECOMMENDED WILDERNESS

First, in Section II–2(a), the Forest Service agreed not to approve timber sales or road construction projects in any areas included in the proposed "Idaho Wilderness, Sustainable Forest and Communities Act of 1993," H.R. 1570 or new proposals by members of Idaho's delegation. ALC asserts this is a significant amendment because it changes the land allocation and management area direction in the Forest Plan and because, under the Forest Plan, timber sales were allowed in these areas. The Defendants argue that this is not a significant amendment because the Forest Plan doesn't directly commit specific areas to development and because the Forest Plan indicates that "[the Forest Service] will build as few roads as possible to implement Forest Plan objectives"(AR Programmatic, Vol. 1, Doc. 1 at 28.) Plaintiffs also note that, according to Defendants' October 8, 1993 letter to "Interested Citizen[s]," none of the three possible timber sales in those areas or two sales in adjacent areas could proceed until after the Plan revision was complete, due to funding restraints. In addition, the Forest Plan Standards include the following regarding wilderness:

> Manage recommended additions to the wilderness system to prevent changes in character ... until Congress makes classification decisions.

(Id. Doc. 2 at II–23.)

As mentioned above, ALC has the burden of demonstrating that the Defendants' actions are arbitrary, capricious, or an abuse of discretion. It appears from the record that Defendants agreed to this provision because it furthered the general

**35.** None of the parties discuss the applicable standard of review regarding ALC's motion. ALC seems to assert that the amendments are per se significant, given its interpretation of the TWS Settlement and the Forest Service guidelines. ALC adds that if summary judgment is denied, its assertion of illegality is entitled to a trial on the merits. Under the standard of review adopted here, this issue shall be resolved on the summary judgment motion.

**36.** The original Forest Plan was adopted in 1987. Revision is required at least every 15 years. In the absence of the TWS Settlement, this Plan would have required revision in 2002. The interim provisions were adopted in September 1993 and have been in place for six years. This is a long period of time relative to the life of a Forest Plan. However, Defendants' decision to postpone the revision until after the Columbia River Basin Plan is completed is itself an exercise of discretion. This decision is clearly not arbitrary or capricious because the Clearwater National Forest Plan must be developed to coordinate with the Interior Columbia River Basin Ecosystem Management Project.

policy of accomplishing forest goals with as few roads as possible, because it affected a part of timber production that was going to be delayed in any case, because it was temporary, and because it met a Plan Standard. ALC has therefore failed to show that the provision is inconsistent with the Forest Plan or that the Defendants acted arbitrarily or capriciously in agreeing to this provision.

## 2. *TIMBER PRODUCTION*

Second, in Section II–2(b), the Defendants agreed to offer no more than 80 million board feet of timber per year. ALC argues this is a significant amendment because the Allowable Sale Quantity (ASQ) in the Forest Plan is 170 million board feet per year and this provision lowers the timber available for sale. ALC argues that the ASQ allows the Forest Service and private parties to plan their future operations. *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir.1993).

The Defendants and Plaintiffs argue that the ASQ in the Forest Plan is intended to be a ceiling, not a quota, that the Defendants have discretion to offer less than the ceiling, and that the ASQ was not actually changed in the Forest Plan.[37] Plaintiffs also argue that funding constraints restricted sales to 80 million board feet absent the TWS Settlement:

> This timber offer [in the TWS Settlement] was developed for the following reasons.
>
> a. The Region's forecast of timber offers through FY 97 supports our previous discussions with the timber industry, forecasting the Clearwater's share of the Region's total to be funded for approximately 60–70 MMBF.
>
> b. We are building a workforce organization to support 70 MMBF.

Clearwater National Forest, FY 1993 Monitoring and Evaluation Report, (AR Programmatic, Vol. IV, Doc. 13, at pp. 77–78.)

In keeping with the guiding nature of forest plans, the Supreme Court recently ruled they do not "give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut," but are tools for agency planning and management. *Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S. 726, 118 S.Ct. 1665, 1670–72, 140 L.Ed.2d 921 (1998). Further, a Georgia district court stated "plain logic also makes clear that implementation which lowers outputs is not a significant amendment, or indeed any amendment, to the Allowable Sale Quantity set forth in the LRMP, which is merely a ceiling." *Southern Timber Purchasers Council v. Alcock*, 779 F.Supp. 1353, 1362 (N.D.Ga.1991). Also, ALC fails to note that in *Resources Ltd.* the court found the ASQ void because it was arbitrarily high. 35 F.3d at 1305.

Here again, Defendants agreed to this provision because it was consistent with the Forest Plan and because it was based on projected sales. ALC has failed to demonstrate that the Defendants' agreement to this provision was an arbitrary exercise of its discretion or inconsistent with the Forest Plan.

## 3. *ENVIRONMENTAL IMPACT STATEMENTS FOR OLD GROWTH*

Third, Section II–2(c) requires field verification of possible old growth stands for all timber harvest and new road construction projects and preparation of an environmental impact statement (EIS) when an old growth stand of 100 acres or more will be affected by the project. ALC argues this is a significant amendment because it "modifies important standards and guidelines used to control management activities ... which affect the ability of the Forest to meet the desired future conditions established in the Forest Plan." (ALC's Opening Br. at 10.)

---

**37.** Preserving the ASQ in the Forest Plan has the effect of limiting timber sales under the

TWS Settlement and sales due to catastrophic events to 170 million board feet per year.

Defendants argue this is not a significant amendment because the Forest Plan articulates a goal of maintaining "sufficient old growth timber suitable to meet the needs of old-growth dependant wildlife on a Forestwide basis." (AR Programmatic Vol. 1, Doc. 2 at II–17.) "Old-growth habitat is a vital component of the vegetative diversity of the Clearwater Forest," *Id.* at H–1. The Forest Plan also states an objective to "[i]mplement a road management program that is responsive to resource protection needs." *Id.* at II–7. And the Record of Decision states "Locating the road away from important wildlife habitat . . . will be done to reduce impact." *Id.* Doc. 1 at 28. Defendants also note that requiring an EIS furthers the NEPA purpose to require agencies to consider environmental issues. *Cady v. Morton,* 527 F.2d 786, 793–94 (9th Cir.1975).

■ It is important to note that this provision does not dictate a result regarding timber sales, once an old growth stand is found. It merely requires preparation of an EIS. Accordingly, Defendants' agreement to this provision clearly furthered the goals in the Forest Plan and therefore was not arbitrary.

### 4. *MAINTAINING WATER QUALITY*

Fourth, Section II–2(d) prohibits projects that would result in a measurable increase in sediment production in drainages not meeting Forest Plan Standards, requires repair of known sediment sources as budgets permit, requires in-stream analysis using methods such as the Riffle Armor Stability Index (RASI) method, and finally requires pre and post-decisional monitoring on the majority of timber harvest and road construction projects that normally require an Environmental Assessment (EA) or EIS. ALC argues these are significant amendments for the same reason as its argument regarding the old growth provision.

Defendants and Plaintiffs argue that these are not significant amendments because the Forest Plan states:

The Forest will continue to provide high quality water and fisheries habitat. In most areas, current high quality water will be maintained. In other areas where past management had adversely affected water quality and fish habitat, improvements in water quality are anticipated.

(AR Programmatic, Vol. 1, Doc. 1 at 4.) The Forest Plan also states the goal to "manage watersheds . . . to maintain high quality water that meets . . . State and Federal water quality standards," *Id.* Doc. 2, at II–3, and to "[s]ecure favorable conditions of flow by maintaining the integrity and equilibrium of stream systems." Id. at II–6. Defendants also argue that they are free to adapt new methods of monitoring that are consistent with the Forest Plan.

■ The record demonstrates this provision of the TWS Settlement is consistent with and furthers the goals of the Forest Plan because it prohibits only those projects that are in areas already in violation of the Plan standards. Further, it only requires repair of sediment sources as budgets permit and only requires pre and post-decisional monitoring on projects where an EA or EIS is normally already required. Finally, like the cases above in which new policies or methods were found non-significant, the monitoring methods adopted in the TWS Settlement simply further the Forest Plan goals and objectives. Consequently, ALC has failed to show that the Defendants acted arbitrarily in agreeing to this provision.

### D. *CONCLUSION REGARDING ALC'S MOTION*

In sum, any settlement agreement with the government in public interest litigation requires that the executive agency exercise its discretion in the interest of its public duties. If the Court were to strike this agreement as void by finding the Defendants had acted arbitrarily, capriciously or in abuse of their discretion, there would be little room left for the public policy of

encouraging settlement agreements. Further, to set up a court ordered public process for provisions of settlement agreements with the Forest Service would simply add an additional layer of administrative process and would deny plaintiffs their independent claims in court. The role of the courts in agency disputes is not administrative but rather to bring judicial finality and resolution to an issue.

In this case, the Court finds that ALC has not met its burden to prove the Defendants acted arbitrarily, capriciously or abused their discretion in offering or agreeing to the provisions of the Settlement. The TWS Settlement interim provisions are consistent with, support, and further the goals and objectives of the Forest Plan. Therefore, the TWS Settlement is not void as a matter of public policy and ALC's motion is granted in favor of the Plaintiffs and Defendants. ALC is hereby dismissed as an intervener subject, of course, to its right to appeal as a party, but is allowed to continue as amicus curiae should there be remaining issues before the Court.

## IX. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL REMAINING CLAIMS

Defendants' motion for summary judgment in their favor on Plaintiffs' remaining claims is the final motion pending before this Court. In response to this motion, Plaintiffs declared, under Fed.R.Civ.P. 56(f), that Defendants are in possession of information on their remaining claims. Plaintiffs named over sixty additional forest service projects that they believe may be at issue. Plaintiffs claim there are other possible violations of law under NEPA, NFMA, CWA, Endangered Species Act, the Wild and Scenic Rivers Act, and the TWS Settlement agreement. Generally, these claims involve water quality, off road vehicle use, approval of salvage timber sales, and wildlife monitoring.

Given the above analysis regarding final agency action and proper exhaustion of administrative appeal procedures, it is not appropriate at this time for the Court to make any determination regarding Plaintiffs' additional claims. Further, under Fed.R.Civ.P. 42, in furtherance of convenience and in the interest of judicial economy and expedition, this Court has the discretion to separate matters before the court. Therefore, Plaintiffs' additional claims are dismissed without prejudice. Plaintiffs have discretion to file another complaint regarding these claims, but they must allege specific violations of law regarding final agency actions which they have properly administratively appealed.

## X. REMEDIES

 In order to obtain a preliminary injunction, plaintiffs have to establish that: (1) there is a likelihood of success on the merits; (2) the balance of irreparable harms tip in their favor; and (3) the public interest favors issuance of an injunction. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988). The standard for a permanent injunction is essentially the same as a preliminary injunction except that the plaintiff must actually succeed on the merits rather than demonstrate a likelihood of success. *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir. 1988). Regarding environmental injury, the Supreme Court has observed:

> [Such] injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542, (1987). More recent cases confirm this approach: "[A]bsent 'unusual circumstances,' an injunction is the appropriate remedy for a violation of NEPA's procedural requirements." *Forest Conservation Council v. USFS*, 66 F.3d 1489, 1496 (9th Cir.1995)(citing *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir.1985)). *See also Neighbors of Cuddy Mountain v. USFS*, 137 F.3d 1372, 1382 (9th Cir.1998); *Idaho*

*Sporting Congress v. Thomas,* 137 F.3d 1146, 1154 (9th Cir.1998).

 In this case, Plaintiffs' claim regarding old growth is based on the Forest Plan minimum standard for old growth habitat. Because it is a minimum standard, violation of the 10% old growth habitat requirement by logging remaining old growth clearly indicates potential irreparable injury. Similarly, Plaintiffs' claims regarding water quality involve a project area in which the Defendants admit the Forest Plan standards for water quality are already being violated. Because the Plaintiffs have demonstrated the potential for irreparable injury regarding both old growth and water quality from the Fish Bate project, the project decision is REVERSED and REMANDED and Defendants are enjoined from further proceeding with the Fish Bate project until such time as the U.S. Forest Service satisfies its NEPA, NFMA, and TWS Settlement Agreement obligations regarding the Fish Bate project consistent with this opinion.