**CONSERVATION CONGRESS and Klamath Forest Alliance, Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE, Defendant.**

**No. CIV. S–07–2764 LKK/KJM.**

United States District Court, E.D. California.

May 13, 2008.

---

8. Petitioner concedes that he obtained the rap sheets from his attorney's file. [Amended

Supplemental Petition 7].

Marianne G. Dugan, Attorney at Law, Eugene, OR, Rachel Marie Fazio, Attorney at Law, John Muir Project, Cedar Ridge, CA, for Plaintiffs.

David B. Glazer, US Department of Justice, San Francisco, CA, for Defendant.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

This action arises from defendant U.S. Forest Service's decision to undertake the Pilgrim Vegetation Management Project on the Shasta–Trinity National Forest. Plaintiffs Conservation Congress and Klamath Forest Alliance have brought suit, alleging that defendant failed to comply with the National Forest Management Act and the National Environmental Policy Act. Specifically, plaintiffs argue that defendant (1) failed to engage in sufficient monitoring of management indicator species, (2) failed to classify a variance from a tree retention standard as significant, (3)

failed to analyze the project's effects on the northern spotted owl, and (4) failed to comply with forest plan requirements pertaining to cavity-nesting species. Pending before the court are the parties' cross-motions for summary judgment. The County of Siskiyou has also filed an amicus brief in support of defendant, which argues that the project is necessary to curb the risk of wildfires. The court resolves the argument upon the parties' papers and after oral argument. For the reasons explained below, plaintiffs' motion for summary judgment is granted in part and denied in part.

## I. Background

Plaintiff Conservation Congress is a non-profit organization dedicated to maintaining, protecting, and restoring the native ecosystems of northern California. Decl. of Denise Boggs ¶ 3. Plaintiff Klamath Forest Alliance is also a non-profit organization, whose primary mission is to promote sustainable forest practices. Decl. of Kyle Haines ¶ 3. Plaintiffs challenge defendant U.S. Forest Service's decision to undertake the Pilgrim Vegetation Management Project ("Pilgrim project") pursuant to the Administrative Procedures Act ("APA"). 5 U.S.C. §§ 701–706.

### A. Pilgrim Project

The Pilgrim project lies northeast of the community of McCloud, California. In recent years, the project area has experienced significant tree mortality from insect attacks in overcrowded portions of the forest and from root disease in ponderosa pine.[1] AR 521. According to defendant, the basic design of the Pilgrim Project contains four components. *Id.* First, the project will thin forest stands that are overcrowded and in which trees face over-competition for water and nutrients. *Id.* Second, the project will remove dead and dying trees from certain stands in order to control the spread of disease and infestation and allow the stands to regenerate. *Id.* Third, in connection with this sanitation harvest, the project will remove smaller, dense understory trees that act as fuel ladders to reduce the likelihood of catastrophic fires. AR 521–22. Fourth, the project will also remove overtopping conifers to allow oak and aspen stands currently being lost due to over-competition to reestablish themselves. AR 522.

The vegetation management treatments will take place on approximately 3,800 acres. AR 166. Specifically, the project will, among other things, undertake the following: commercial thinning and sanitation harvest on 3,100 acres of assertedly overstocked coniferous stands, regeneration treatment in 415 acres of diseased and insect-infested stands and replanting with conifer seedlings, and restoration of 275 acres of dry meadows by removal of encroaching conifer trees. AR 155. With respect to the regeneration treatment on the 415 acres,[2] the otherwise applicable standard of retaining 15% of the largest green trees (the "15% GTR" standard) will not be met on 255 acres, because defendant maintains that there are not enough disease-free trees to meet the standard. *Id.*

Defendant issued its Record of Decision and Final Environmental Impact Statement ("EIS") on June 1, 2007. AR 153.

---

1. This was ascertained through field studies. Administrative Record ("AR") 168 ("Each stand within the project area was field examined by a Certified Silviculturist to determine current stand attributes including age, site class, mortality level, presence of root disease, and stand density."); AR 170 ("Field review in June 2005 showed that the stands are continuing to succumb to western pine beetle attacks.").

2. The "regeneration treatment" was also referred to as "Clearcut w/Reserve Trees." AR 2901.

Defendant considered three other alternatives to the one ultimately selected. The No–Action Alternative would implement no vegetation management actions. AR 524. It was rejected because it would allow for disease, insect infestation, and hazardous fire conditions to continue and spread. Another alternative was similar to the alternative ultimately adopted except that it would retain the 15% GTR standard. *Id.* It was rejected because the 15% GTR standard purportedly could not be met given tree mortality conditions. Finally, the last alternative would have only thinned overstocked stands on 535 acres to a 60% or greater canopy closure but would otherwise conduct thinning in the same manner as the preferred alternative. *Id.* This alternative was rejected because it would not sufficiently address tree mortality.

## B. Statutory and Regulatory Structure

### 1. NFMA

The Forest Service manages the national forests pursuant to its duties and obligations under the National Forest Management Act ("NFMA"). 16 U.S.C. § 1600 *et seq.* One of these duties includes the duty to "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B). The Forest Service uses management indicator species ("MIS") to gauge the effects of management activities. An MIS species is a bellwether, or class representative, "for other species that have the same special habitat needs of population characteristics." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.,* 88 F.3d 754, 762 n. 11 (9th Cir.1996).

Management occurs at both the forest level and the individual project level. At the forest level, the Forest Service develops a Land and Resource Management Plan ("LRMP" or "forest plan"), which is a broad, long-term planning document for an entire national forest. "These plans operate like zoning ordinances, defining broadly the uses allowed in various forest regions, setting goals and limits on various uses ... but do not compel specific actions." *Inland Empire Public Lands Council v. U.S. Forest Serv.,* 88 F.3d 754, 757 (9th Cir.1996). At the project level, NFMA mandates that site-specific projects (such as resource plans, permits, contracts, or other instruments for occupancy and use of forest lands) "shall be consistent with the land management plans." 16 U.S.C. § 1604(i). Once a forest plan is approved, the Forest Service implements the plan by approving or denying site-specific actions. *Forest Guardians v. U.S. Forest Serv.,* 329 F.3d 1089, 1092 (9th Cir. 2003).

### a. Applicable Regulations

The parties disagree as to which set of NFMA regulations—those promulgated in 1982 or 2000—apply here.[3] It is not at all clear, however, why this dispute is material. It appears that the legally relevant question ostensibly sought to be answered by this dispute is whether monitoring the habitat of MIS species is a permissible substitute for monitoring the population of MIS species (the so-called "proxy-on-proxy" approach). As detailed in the analysis section below, however, Ninth Circuit case law interpreting the 1982 rule concluded that such habitat monitoring was permissible, at least under certain circumstances. Similarly, the 2000 rule also permitted habitat monitoring as a surrogate

---

**3.** Both parties agree that another set of regulations, passed in 2005, are no longer in effect because of the injunction issued in *Citizens for Better Forestry v. U.S. Dep't of Agric.,* 481 F.Supp.2d 1059 (N.D.Cal.2007). Both parties also agree that the recently revised regulations, promulgated on April 21, 2008, 73 Fed. Reg. 21,468 (Apr. 21, 2008), do not apply to the project because of a transition provision.

for species monitoring (under the general direction that officials consider the "best available science" in implementing forest plans).[4] Thus, for purposes here, it is immaterial which set of regulations apply.[5]

### b. Shasta–Trinity National Forest Land and Resource Management Plan

Regardless of whether the 1982 or 2000 regulations apply, it is clear that site-specific projects must nevertheless be consistent with the governing forest plan. Here, the governing forest plan for the Shasta–Trinity National Forest ("STNF") is the STNF LRMP, which was adopted in June 1995. AR 4063–4411. That plan also incorporates the Northwest Forest Plan, which was adopted in April 1994 to provide a regional strategy for addressing issues related to the northern spotted owl ("NSO"), a threatened species under section 4 of the Endangered Species Act. 16 U.S.C. § 1533.

To provide for diversity of wildlife, the STNF LRMP denominated several management indicator assemblages. AR 4109. The assemblages are named by either their habitat or habitat components, such as Late Seral, Openings and Early Seral, Multi-habitat, Hardwood, and Snag and Down Log (the assemblages relevant to the present action). *Id.* There are a total of nine wildlife assemblages and three fish assemblages, although not all assemblages are used as management indicators for

every project. AR 4109. The planners also listed examples of species that would be associated with each assemblage. Thus, for example, the species associated with the Late Seral assemblage include the NSO, goshawk, fisher, marten, Towbridge shrew, and northern flying squirrel. AR 4110.

The STNF LRMP also established a rather inscrutable "Monitoring Action Plan"[6] with three levels of monitoring, ranging from the general to the more specific. AR 4305–06. First, at the highest level, is "validation" of the MIS monitoring program. AR 4306. Validation is conducted "to determine if changes are needed in management practices ... to provide adequate protection to wildlife." AR 4306. This validation occurs at the regional and forest-wide level every ten years. AR 4306. Second, at the intermediate level, is "effectiveness monitoring," which, according to defendant, ascertains whether certain management activities are having their desired effects, as measured by changes in an indicator species or habitat components. The plan directs officials to "[u]se appropriate indicator species *or* habitat components to represent the assemblages." *Id.* (emphasis added). Effectiveness monitoring is conducted every one to five years, and is reported every five years. Third, at the lowest level, is "implementation monitoring," which "ensure[s] that management requirements

---

**4.** It is not at all clear to the court that habitat monitoring is a better "available science" than species monitoring, or in what sense it is superior. The plaintiffs, however, while objecting to habitat monitoring as violative of the forest plan, do not rely upon the question of whether it is the best available science. Accordingly, the court does not consider the question further.

**5.** At oral argument, the parties essentially conceded that the dispute was immaterial to the outcome of the litigation.

**6.** This document is laid out in table format and is comprised of mostly sentence fragments. It displays the following categories: Activity, Practice, or Effect; Techniques and/or Data Sources; Intensity and Standard; Frequency of Measuring/Reporting; Expected Precision/Reliability; and Variability in Standard Which Would Require Further Evaluation and/or Corrective Action.

and standards and guidelines are being met or exceeded with on-the-ground activities." AR 4305. This monitoring is ongoing but is reported every two years. *Id.*

### 2. NEPA

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f, is essentially a procedural statute that requires federal agencies to analyze foreseeable environmental impacts of major federal actions and to explore possible alternatives. 42 U.S.C. §§ 4321, 4331; 40 C.F.R. § 1501.1. Its primary purpose is to ensure that federal agencies take a "hard look" at the environmental consequences of proposed actions. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350–51, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). When an agency proposes a major federal action that significantly affects the quality of the human environment, it must prepare an Environmental Impact Statement. 42 U.S.C. § 4332(2)(C).

### II. Standard

■ In challenges to final agency action, the court does not employ the usual summary judgment standard for determining whether a genuine issue of material fact exists. *Home Builders Ass'n of N. Cal. v. United States Fish & Wildlife Serv.,* 268 F.Supp.2d 1197, 1206 (E.D.Cal.2003). This is because the court is not generally called upon to resolve facts in reviewing agency action. *Id.* at 1207; *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769–70 (9th Cir. 1985). Instead, the court's function is to determine whether or not, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did. *Occidental Eng'g,* 753 F.2d at 769–70; *Home Builders Ass'n,* 268 F.Supp.2d at 1207.

■ The APA authorizes the court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Nw. Envt'l Def. Ctr. v. Bonneville Power Admin.,* 477 F.3d 668, 682 (9th Cir.2007). While "the scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency," "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 687 (internal quotation marks omitted).

■ "That is, an agency must cogently explain why it has exercised its discretion in a given manner and in reviewing that explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotation marks omitted). The court "may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Beno v. Shalala,* 30 F.3d 1057, 1073 (9th Cir.1994) (internal quotation marks omitted).[7]

### III. Analysis

#### A. MIS Monitoring

##### 1. STNF LRMP

Plaintiffs' principal claim is that defendant failed to conduct adequate MIS monitoring in deciding whether to undertake the Pilgrim project. Here, the monitoring requirements imposed by the STNF LRMP are less than pellucid. The Monitoring Action Plan, under the heading of

7. The danger of ambiguity is that it, in effect, permits the court to substitute its judgment for that of the agency. That fact suggests that at the least reasonable clarity is required.

Here, where much of the agency's record is far from comprehensible, the court must resist the temptation to decide under the guise of interpretation.

"effectiveness monitoring," directs officials to "[u]se appropriate indicator species or habitat components to represent the assemblages. Survey for occupancy, reproductive success, population stability and growth, ecological health." AR 4306. On the one hand, the plan is clearly written in the disjunctive, permitting *either* population monitoring *or* habitat monitoring. To read the plan as plaintiffs urge would render the word "or" a nullity. On the other hand, terms such as "occupancy" and "reproductive success" clearly refer to animal species biology and thus would only make sense in the context of population monitoring. AR 3115. It could be the case that the portion of the plan incorporating these terms is only meant to be relevant if and when population monitoring is undertaken; but if that was the plan's intended purpose, its wording hardly conveys that intent. In any event, the court need not resolve the issue, because, as explained below, even assuming that the plan permits either habitat monitoring or population monitoring—the interpretation urged by defendant—the court is unpersuaded that habitat monitoring is appropriate given the facts of this case.

### 2. Proxy–On–Proxy Approach

■ The purpose of monitoring MIS is to estimate the effects of proposed management activities on fish and wildlife populations. *Inland Empire*, 88 F.3d at 754 n. 11. MIS are selected as proxies for other species that have the same habitat needs or population characteristics. *Id.* While some circuits have barred the use of monitoring the habitat of MIS as a proxy for monitoring MIS themselves, *see Utah Envtl. Congress v. Bosworth*, 372 F.3d 1219 (10th Cir.2004); *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir.1999), the Ninth Circuit has not. Instead, the Ninth Circuit has permitted the use of this so-called "proxy-on-proxy" approach so long as certain conditions are satisfied. "Our case

law permits the Forest Service to meet the wildlife species viability requirements by preserving habitat, but only where both the Forest Service's knowledge of what quality and quantity of habitat is necessary to support the species and the Forest Service's method for measuring the existing amount of that habitat are reasonably reliable and accurate." *Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1250 (9th Cir.2005); *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) ("the Forest Service's decision to use habitat as a proxy for fish populations was not arbitrary and capricious").

Even when interpreting the 1982 regulations (which are arguably more demanding than the 2000 regulations), the Ninth Circuit held that habitat management was permissible. *Inland Empire*, 88 F.3d at 761–62 ("We recognize that the [Forest] Service's methodology necessarily assumes that maintaining the acreage of habitat necessary for survival would in fact assure a species' survival. The Service is entitled to rely on reasonable assumptions in its environmental analyses."); *id.* at 761 n. 8 ("We therefore reject Plaintiffs' argument that the Service must assess population viability in terms of actual population size, population trends, or the population dynamics of other species.").

■ Nevertheless, habitat monitoring is only permissible where two conditions are satisfied: first, there must be an accurate and reliable correlation between habitat health and species health, and second, the methodology for measuring habitat must also itself be accurate and reliable. *See Native Ecosystems Council*, 428 F.3d at 1250; *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir.2004) ("The test for whether the habitat proxy is permissible ... is whether it 'reasonably ensures' that the proxy results mirror reality."); *Lands Council v. Powell*, 395 F.3d 1019, 1036 n.

23 (9th Cir.2005) ("The 'proxy on proxy' approach to studying MIS population trends operates on the assumption that as long as a species' habitat is maintained, the species will likewise be maintained."); *Inland Empire,* 88 F.3d at 762–63 ("Because the number of remaining nesting and feeding territories has a *direct impact* on the population of the species, the EIS effectively predicts a slight downward population trend in pileated woodpeckers as a result of the timber sales.") (emphasis added).

With respect to the demonstrating of an accurate and reliable relationship between habitat health and species health, *Gifford Pinchot* is instructive. 378 F.3d at 1066–67. There, the Ninth Circuit permitted the use of proxy-on-proxy analysis—first approved in the NFMA context in *Inland Empire*—in the context of the Endangered Species Act. It characterized *Inland Empire* as embodying "the principle of allowing an agency to use proxy modeling to evaluate species population so long as that proxy has a high correlation with the relevant species' population." *Id.*, 378 F.3d at 1066 n. 4. "If the modeling approach was reasonable in ensuring an accurate population estimate of a species for NFMA purposes, it follows that a similar modeling approach to estimate species population for ESA purposes is permissible." *Id.* The issue in *Gifford Pinchot* was whether the Fish and Wildlife Service ("FWS") properly analyzed the jeopardy to the NSO posed by a proposed timber harvest. Under the facts of the case, the Ninth Circuit found that the "detailed model for owl population [was] sufficient to ensure that the FWS's habitat proxy reasonably correlates to the actual population of owls." *Id.* at 1066

(noting also that "the habitat proxy [did] not exist in a vacuum" because FWS had conducted demographic studies to verify habitat results).

Similarly, with respect to measuring habitat itself, the agency must also employ an accurate and reliable methodology. The habitat analysis in *Gifford Pinchot,* for example, was "not just a simple 'x number of acres = y number of owls' type of equation." *Id.* Instead, the agency had taken into account the type of land, the extent of existing degradation of the habitat, the owls' distribution, the owls' range, and non-habitat factors, including competition from other species, insects, and disease. *Id.* Conversely, where the agency's methodology for measuring habitat relies on unverified assumptions, proxy-on-proxy analysis is inappropriate. In *Earth Island Institute,* the Forest Service listed the project areas that were "assumed to provide high and moderate capability habitat." *Earth Island Institute v. U.S. Forest Serv.,* 442 F.3d 1147, 1175 (9th Cir.2006). The Ninth Circuit rejected this analysis, because there was no identification of the methodology used in determining what constituted suitable habitat. *Id.*, 442 F.3d at 1175–76.

### 3. Pilgrim Project

Here, defendant selected five habitat assemblages based upon the types of habitat present in the project area. These assemblages included Late Seral, Openings and Early Seral, Multi-habitat, Hardwood Assemblage, and Snag and Down Log. AR 235. It then analyzed each alternative examined in the EIS in terms of its potential impact on each selected habitat assemblage.[8] AR 483–86. Finally, defendant

---

8. This portion of the analysis, as reported in the Project Level Management Indicator Assemblage Report ("assemblage report"), appears reasonably detailed. That report first summarized the thirteen different treatment types prescribed by the project (e.g., thinning,

regeneration harvest, hardwood management). AR 480. It then analyzed the effects of each of the thirteen treatment types by each of the three alternatives (excluding the No–Action Alternative). AR 482–84. For ex-

supplemented its habitat monitoring by selecting certain individual species and analyzing the potential effects of each project alternative in relation to population trends for the selected species. AR 486–513.

Plaintiffs argue that defendant has failed to document a sufficient relationship between habitat health and species health. Here, the mule deer was selected to represent the Open and Early Seral and Multi–Habitat assemblages, the white-breasted nutnatch was selected to represent the Hardwood assemblage, and the red-breasted nuthatch was selected to represent the Late Seral and Snag and Down Log assemblage. "These species were selected because they are found within the project area, the populations are known to be sensitive to habitat quality and there is high confidence population trend data for each." AR 235.

### a. Mule Deer

■ Defendant analyzed the habitat for mule deer based on various factors, including quality of forage (with a preference for deer brush, willow, and bitterbrush), cover and water, and cover-to-forage ratio (with an ideal ratio of 50:50). AR 236. In terms of the Open and Early Seral assemblage, the project would convert 535 acres of deer cover habitat into deer forage habitat for fifteen to twenty years while the planted conifer trees of regeneration harvest grow into pole size stands or mid-seral habitat. AR 237. The forage-to-cover ratio would be 2:1 immediately post-harvest, which is within the range of moderate habitat quality. *Id.* While the project would increase the openings and seral stage habitat on the forest (representing a net .07% gain in forage habitat for the mule deer), and might indirectly stem the risk of fires (through thinning) that would create more

of such habitat, these net effects were deemed insignificant. AR 494; AR 495 ("the final analysis is 'no observable effects.' ").

Range-wide data from the California Department of Fish and Game indicates that mule deer population has been decreasing since the early 1960s. AR 494. The State of California believes the decrease to be attributable to reductions in early seral habitat, whereas the Mule Deer Foundation believes it is due to heavy predator pressure. *Id.* "Currently, the available data is not sufficient to conclude the causes of the decline." *Id.*

This admitted uncertainty makes proxy-on-proxy analysis inappropriate. Such analysis is only appropriate where the habitat "has a high correlation with the relevant species' population." *Gifford Pinchot,* 378 F.3d at 1066 n. 4. Here, the EIS itself indicates that a potential confound of predator pressure makes the link between habitat health and species health sufficiently complex that habitat is an inappropriate proxy for species. Defendant counters that the only thing that it can directly control is the condition of the habitat, rather than the population of species. But that is not what is being asked of defendant. The purpose of monitoring is to gauge the effects of proposed management activity on species; that purpose can still be served by monitoring either management indicator species directly, or, where appropriate, their habitat. Indeed, defendant appears to argue that the species represent the habitat, rather than reverse. This improperly inverts the relationship such that species become the proxy for habitat.

Where the agency cannot show that impacts on habitat will correlate with impacts on species' population, as here, habitat

ample, the assemblage report indicated that the regeneration harvest used by the three alternatives would convert all 415 acres of

Late Seral assemblage existing before the project into 415 acres of Openings and Early Seral assemblage post-project. AR 483.

monitoring is inappropriate. Because it is unclear whether the decline in mule deer population is attributable to a decline in their relevant habitat, it was improper for the agency to rely on monitoring of such habitat.

#### b. White–Breasted Nuthatch

 Although white-breasted nuthatches can survive in coniferous forests, they have a strong association with hardwoods. AR 495. They tend to nest and live in old woodpecker holes and will excavate their own cavities in soft snags (dead, standing trees) over 14″ diameter at breast height. AR 495–96. In the project area, the hardwood habitat is comprised of twenty acres of scattered aspen. AR 496. Due to this limited size, forage opportunity is poor. *Id.* Soft snags are also uncommon due to rapid felling from termites and carpenter ants, and thus the white-breasted nuthatches tend to nest in woodpecker holes. *Id.* The project would remove competing conifers and increase the presence of aspen. AR 497.

The assemblage report found that "[a]lthough we [ ] lost 14,856 acres of hardwood habitat on the Forest due primarily to wildfire . . . hardwoods frequently respond well to fire and hardwoods are likely to replace the burnt stand." AR 498. In addition, "[c]urrent policy on the Forest is to retain and enhance growing conditions for hardwoods . . . Given this retention, we believe hardwood occurrence is likely to be stable or increasing despite the known losses from wildfire." *Id.*

Meanwhile, the population of white-breasted nuthatches in the local and surrounding strata has been increasing. AR 499. Strata are divided at the regional level according to similar habitats, conditions, and fauna. AR 475. "Particularly with highly mobile animals such as birds, these biogeographic regions allow [the pooling of] data from individual routes,

evening out the highly variable data at a route level." *Id.* Accordingly, it appears that, because the habitat and population of the white-breasted nuthatch are correlated with one another, the Forest Service could properly rely on the use of the former.

#### c. Red–Breasted Nuthatch

 The red-breasted nuthatch is a common resident in coniferous forests. AR 500. It depends on snags for nesting sites, and is attracted to mature mixed conifer, which make it representative of the Snag and Down Log assemblage and the Late Seral assemblage. *Id.;* AR 508. The average snag density in the project area is measured at three per acre, AR 501, and Snag and Down Log assemblage habitat has been increasing despite loss due to wildfire and harvest, AR 505. Similarly, there has been a net gain in Late Seral habitat. AR 511.

The population of red-breasted nuthatches showed statistically insignificant increases in the local strata and statistically insignificant decreases in two nearby strata. AR 505. It also showed a statistically significant increase in one nearby strata and a statistically significant increase survey wide. *Id.* The report stated that given these mixed results, "it is hard to conclude that there is any significant relationship between forest wide increases in late seral assemblage habitat type and population trends for the red-breasted nuthatch." *Id.* Thus, as with the mule deer analysis, the court concludes that there is an insufficient basis for defendant's reliance on the habitat of the red-breasted nuthatch.

#### 3. Selection of Species

 Plaintiffs also argue that defendant should have selected the NSO as one of its management indicator species, because the Pilgrim project is within a Critical Habitat Unit ("CHU") for the NSO.[9] As an initial

---

**9.** The Fish and Wildlife Service has proposed dropping the area encompassing the project

matter, however, it is important to note that defendant conducted a separate Biological Assessment ("BA") of the project's impacts on the NSO. The BA is appended to the EIS, AR 339–92, and the Fish and Wildlife Service concurred in the assessment.[10] AR 393–428. Impacts to the NSO were also discussed in the EIS as well. AR 217–26. Accordingly, it appears that plaintiffs' criticism is primarily one of form rather than substance.

Defendant also notes that the project area does not contain NSO habitat that would qualify as suitable under the Forest Service's Habitat Capability Model except to the extent that it may contain stands that constitute transient "dispersal" habitat. AR 347, 353. This is because of the project area's generally discontinuous forest canopy, insufficient slope, and lack of open water and suitable prey. AR 347–50, 355, & 366–67. As of 2004, no owls had been spotted within 1.3 miles of the project area (the typical NSO home range radius) over the previous twenty years. AR 347–50, 355, 366–67. In addition, defendant argues that insect infestation and disease makes it likely that the project area will become even less suitable as NSO habitat in the future. AR 347–49.

The fact that the habitat at issue is for dispersal does not undermine its significance: the area was designated a CHU to provide for easterly distribution of the NSO. AR 2784. But the fact that NSO have not been using it as dispersal habitat, and that the area will become further degraded due to insect infestation and disease, are more valid considerations. The Fish and Wildlife Service found that the proposed project would have an adverse effect on the dispersal habitat but concluded that, due to the factors cited above and "the limited amount of dispersal habitat to be affected in the action area (i.e., 673 acres), the Service does not expect that this adverse affect will impede the ability of the action area to provide for the intended conservation needs of the [NSO]." AR 2789. In light of all these considerations—the fact that impacts to the NSO were analyzed in a separate BA, that NSO have not used the project area as dispersal habitat for over twenty years, and that the area will become more degraded due to insect and disease—the court cannot conclude that that defendant's decision not to select the NSO as one of its MIS species was arbitrary or capricious.[11]

---

from the CHU. 72 Fed.Reg. 32,450, 32,472 (map), 32,516 (map) (Jun. 12, 2007) (Proposed Revised Designation of Critical Habitat for the Northern Spotted Owl). Of course, until it actually does so, that proposal is not immediately relevant.

**10.** "[W]e concur with your determination ... based ... on the following: (1) no northern spotted owls or activity centers are known to occur within 1.3 miles of the proposed action based on recent surveys; and (2) foraging activity by potential dispersing northern spotted owls is highly unlikely and discountable due to habitat fragmentation poor habitat conditions extensive amount of diseased trees lack of water supply and associated low prey density." AR 395.

**11.** In addition to the NSO, plaintiffs also argue that the black bear should have been used instead of the red-breasted nuthatch. But as defendant explained, black bears would be poor MIS species because they are transient and wide-ranging, using a wide variety of different habitats.

Plaintiffs also maintain that the acorn woodpecker should have been used instead of the white-breasted nuthatch, because the white-breasted nuthatch prefers to forage on deciduous trees whereas the project area contains almost entirely coniferous trees. However, one of the purposes of the project is to release previously suppressed hardwood habitat, AR 522, and the white-breasted nuthatch is listed in the LRMP as representative of that assemblage.

#### 4. Breeding Bird Survey Data

 Plaintiffs also argue that the population data for red-and white-breasted nuthatches is derived from the Bird and Breeding Survey ("BBS"), which is conducted at a scale inappropriate for assessing project-specific impacts.[12] The BBS, prepared by the U.S. Geological Survey, contains a "disclaimer" on use that states: "The survey covers such a large area that regional differences in number and quality of survey routes are inevitable." The disclaimer, however, also goes on to report that the BBS is extensively used for both agency decision-making and academic research, and that more than 270 scientific publications have relied on its data.

*Earth Island Institute* expressed reservations about the use of BBS data. 442 F.3d at 1174. In particular, it found that reliance on BBS data for the Williamson's sapsucker and black-backed woodpecker were insufficient as they were "listed in the 'red' category, meaning the results are 'very imprecise,' " and the hairy woodpecker was "listed in the 'blue' category, which reflects data of 'moderate precision.' " These reservations thus appear to be reasonably fact-specific. *Cf.* AR 3446 (both red-breasted and white-breasted nuthatch rated at the highest credibility level); AR 499 (examining three strata—Pitt Klamath Plateau, California, and California Foothills—with highest level of credibility given by BBS). Accordingly, the court finds that the use of BBS data in this case was permissible.

#### B. Fifteen Percent Green Tree Retention Standard

Under the NFMA, an amendment to a forest plan that results in a "significant" change must be adopted through the same procedures required of the initial forest plan itself (e.g., preparation of an EIS). 16 U.S.C. § 1604(d) & (f)(4). Here, the STNF LRMP provides that fifteen percent of the area associated with each cutting unit (stand) shall be retained (i.e., the 15% GTR—green tree retention—standard). AR 4047. On a portion of the project area (approximately 255 acres of the project's 3,800 acres), however, this standard will be violated. The issue here is not whether this variance was substantively justified but whether defendant's procedural treatment of the variance as a non-significant plan amendment was an abuse of discretion. *Wilderness Soc'y v. Bosworth*, 118 F.Supp.2d 1082, 1110 (D.Mont.2000) ("[T]he determination of whether or not an amendment is significant is a discretionary decision.").

 As an initial matter, defendant argues that plaintiffs failed to raise this issue at the administrative level and therefore waived the argument. Two other organizations, however, did raise this issue. AR 52. There is no need for a litigant to have personally raised the issue, so long as the issue was raised by another party and the agency had the opportunity to consider the objection. *Kern v. BLM*, 38 F.Supp.2d 1174, 1180 (D.Or.1999), *rev'd on other grounds*, 284 F.3d 1062 (9th Cir.2002); *City of Sausalito v. O'Neill*, 211 F.Supp.2d 1175, 1198 n. 3 (N.D.Cal.2002), *aff'd in part and rev'd in part on other grounds*, 386 F.3d 1186 (9th Cir.2004). Defendant responds that these cases did not involve statutorily mandated administrative exhaustion, as implicated here, and that the Supreme Court has held that where exhaustion is mandated by statute, it cannot be waived. *See, e.g., Darby v. Cisneros*, 509 U.S. 137, 153–54, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). Of course, the court

---

**12.** Although this issue of BBS data reliability is effectively moot for the red-breasted nuthatch (given the court's earlier finding that habitat analysis for this species is inappropriate), it is not moot for the white-breasted nuthatch.

is not "waiving" any exhaustion requirement; rather, the court concludes that the exhaustion requirement was fully satisfied by virtue of other organizations who voiced the objection.

On the merits, the issue of whether a plan amendment is significant is guided by several factors, including the timing and duration of the proposed change, the location and size of the project, and whether the change would alter the long-term relationships between the levels of goods and services provided by the Forest. Forest Service Handbook at 1909.12.5.32 (Aug. 3, 1992); *Wilderness Soc'y*, 118 F.Supp.2d at 1110 (citing Forest Service Handbook).

With respect to timing, amendment of the GTR standard would be in effect only for the treatment duration of the affected cutting units, and would not be a permanent plan amendment. AR 287. Thus, after the project's completion, the 15% GTR standard would remain in place for other areas of the forest.[13]

■ With respect to size, the variance from the GTR standard impacts 255 acres of cutting units. *Id.* Specifically, between less than .0001% and .004% of commercial forest lands and between less than .0001% and .02% of late successional forest in the watershed would be affected. *Id.; cf. Am. Wildlands v. U.S. Forest Serv.*, No. 97–160, 1999 U.S. Dist. LEXIS 22243, at *17–20 (D.Mont. Apr. 14, 1999) (finding significance where amendment would have affected between 3% and 13% of forests at issue, or 160,000 acres). Plaintiffs respond, however, that the project area will impact 5% of the available stands for NSO in the relevant watersheds that serve as dispersal habitat and sometimes foraging habitat. AR 2815. As noted above, however, no NSO has used the project area for dispersal habitat in the last twenty years,

and the condition of the dispersal habitat is expected to degrade even further.

Finally, defendant argues that the variance is necessary because it will actually work toward meeting the goals of the LRMP by controlling a root disease problem that would result in greater losses to forest cover if no action were taken. AR 287. One of the alternatives would have retained the 15% GTR standard but was rejected because most of the diseased trees that would have been retained under this alternative would die within two to ten years. AR 207–08. "Leaving up to 15% live, root diseased pine trees on approximately 255 acres of the regeneration harvest stands would continue the root disease cycle within these stands and to adjacent stands as root disease can spread underground." *Id.*

This last argument has particular intuitive appeal—why retain trees that will shortly die anyhow? Plaintiffs' response is twofold. First, plaintiffs argue that decadent trees are also beneficial to certain species, so it is inappropriate to think of the 15% GTR standard as applying only to healthy trees. But defendants note that while the decadent trees might persist for a time, they would ultimately fall down altogether and eliminate even their usefulness for cavity-nesting species. Second, plaintiffs argue that the 15% retention rule already took into account the role of insects and disease. AR 4196 ("Forest stand densities are managed to maintain and enhance growth and yield ... recognizing the natural role of fire, insects, and disease."). The cited section of the forest plan, however, appears to discuss the 15% retention of pockets of late-successional forest across the watershed, rather than the 15% retention standard that applies to individual cutting units. The 15% require-

---

13. Nonetheless, as far as the area affected is concerned, the change is permanent since

there will be no green trees in the clear cut area.

ment as it applies to watersheds is not violated by the project. AR 213 (post-project, 28% for Ash Creek Watershed and 20% for Upper McCloud Watershed).

In sum, the size of the project weighs in favor of finding that the variance was a non-significant plan amendment. Similarly, while the issue of whether the trees at issue on the 255 acres would inevitably die is a more complex issue, it too appears to weigh in favor of defendant. Based upon the totality of the circumstances, the court finds that defendant permissibly exercised its discretion in construing the variance as a non-significant plan amendment.

## C. Impacts to NSO

NEPA requires federal agencies to analyze foreseeable environmental impacts, including cumulative impacts, of major federal actions. 42 U.S.C. § 4332(2)(c)(i). Cumulative impacts are impacts "on the environment which result[ ] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future action ... Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. Agencies must identify the area in which the effects of the project will be felt, the impacts from the project in that area, and other past, proposed, and future actions. *See City of Carmel–By–The–Sea v. U.S. Dep't of Transp.,* 95 F.3d 892, 902 (9th Cir.1996).

Here, plaintiffs argue that defendant used an inappropriate scale for its impacts analysis. In particular, plaintiffs contend that the review of cumulative impacts to NSO was too large and that "[t]he only apparent reason for using such a large analysis area ... was to try to minimize the stated impacts to the NSO." Of course, there is no one-size-fits-all approach for impacts analysis: sometimes, agencies should employ larger geographic

scales, *Idaho Sporting Congress,* 305 F.3d at 973, whereas other times, agencies should employ smaller geographic scales, *Anderson v. Evans,* 314 F.3d 1006, 1021 (9th Cir.2002).

Here, defendant selected an analysis area of 89,000 acres of public and private land for the NSO. AR 220. It appears that, contrary to plaintiffs' concern, the analysis area was selected to include impacts, rather than to hide them: "This cumulative effects area was used because there are two other vegetation management projects currently being planned within the CHU and will overlap in time with this project." AR 220. These two projects, the Mudflow Project and the Algoma Project, were specifically discussed in the EIS. AR 221–22. In addition, as plaintiffs note, the EIS discussed several other projects, including the Mt. Thin and Fuels Project, the Edson Project, the Davis Vegetation and Road Management Project, the McCloud Flats Phase I Project, the Mud Forest Health Project, and the South Flats Multiproduct Project, the acreage of affected habitat for each project, and the harvest methods used. AR 220–21.

The EIS then analyzed these cumulative effects in conjunction with the preferred alternative, finding that within CHU CA–2 "[t]he combined effects of the proposed action with these effects would/has result in the removal of approximately 2,000 acres of foraging/dispersal habitat ... and the temporary degrading of approximately 4,200 acres of [such] habitat. Most of the removed habitat (about 1,800 acres) is the result of root disease and [ ] infestations." AR 224.

Further, as defendant argues, had it ended its cumulative effects analysis at the local level, it would have been *easier* to conclude that the project had no significant adverse impact on NSO habitat. This is

because, as noted above, the project area is largely unsuitable as NSO habitat due to the land's natural conditions, and no owl has been spotted within the 1.3 miles of the project area for over twenty years.[14] AR 347–50, 355, & 366–67.

Finally, the EIS found that "[t]he greatest cumulative impact to the [NSO] and its critical habitat in CHU CA–2 is the continued loss of habitat from insect infestations and root disease centers." AR 222 (noting that, in the last five years, three percent of forage/dispersal habitat in CHU have been lost to insects and disease). Conversely, where vegetation treatments have been implemented in the last five years, they have benefitted owl habitat in the analysis area. AR 414. While plaintiffs argue that speculative long-term gains do not outweigh short-term losses, *Pacific Coast Federation of Fishermen's Ass'ns v. National Marine Fisheries Service*, 265 F.3d 1028, 1036 (9th Cir.2001), it is the short-term losses here that seem the most speculative. *See Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1017 (9th Cir.2006) ("[W]e conclude that the [Environmental Assessment] adequately discloses and discusses the short-term increase of fire risk, and USFS's conclusion that the Project will meet the goal of long-term risk reduction is not arbitrary or capricious").

In sum, the court finds that the impacts analysis was sufficient and conducted on an appropriate scale.

## D. Cavity–Nesting Species

■ Finally, plaintiffs argue that defendant violated the LRMP's requirements regarding cavity-nesting species. The plan provides that "snags are to be retained ... based on ... an average of 1.5 snags per acre greater than 15 inches in diameter and 20 feet in height." AR 4048. In fact, the project aims to do better than that, retaining an average of 2–3 snags per acre where feasible. AR 187; AR 501 ("snag density was set to 2 per acre with the expectation that more pathogenic activity would create an excess of 3 snags per acre. This exceeds the minimum standards established in the [LRMP].")

The EIS indicates that where not even the 1.5 snags per acre requirement can be met, "one 10x10 minimum slash pile or equivalent 5–15 tons maximum large deadwood per acres will be left unburned where tractor piling is described." AR 346. The EIS explained that in some cases, there simply are not enough snags available, particularly where the stand in question is still relatively young. AR 446 ("Most of the plantations being treated in this project are from brushfield conversions; few if any snags existed in the reforested areas at the time they were planted. The trees in the plantations are not large enough to meet the LRMP size requirements for snags."). Although plaintiffs argue that this violates the LRMP, the requirement is obviously only one that needs to be satisfied where it is at least possible to do.

Furthermore, the requirement must be satisfied on "average," and it appears that the project will in fact exceed the 1.5 snags per acre requirement on average. Indeed, the EIS predicts that the project will ultimately produce snags of better quality,

---

14. Plaintiffs note that in 2003, one owl was spotted—not in the project area or within the 1.3 mile radius but in the adjacent Elk Flat Late–Successional Reserve. The BA concluded that the owl likely moved on in search of adequate prey and habitat because the Elk Flat LSR habitat is low capability, and the project area "is naturally considerably worse." AR 2810; AR 357 ("Because the operation will not modify the limiting factors making the area unsuitable ... it is highly unlikely that owls would occupy the area post-project.")

because thinning understory trees leads to more vigorous growth in the remaining trees, which will in turn produce better quality and larger snags. AR 240. Accordingly, the court rejects plaintiffs' claim that the project violates the forest plan's requirements with respect to cavity-nesting species.

## IV. Conclusion

For the reasons explained above, both plaintiffs' and defendant's motions for summary judgment are granted in part and denied in part. The court finds that defendant failed to comply with its monitoring obligations under the relevant forest plan, in violation of the NFMA and APA. Accordingly, it enjoins the Pilgrim project and remands the matter to the agency for further action consistent with this order. The clerk's office is directed to enter judgment and close the case.

IT IS SO ORDERED.